# EISEN *v.* CARLISLE & JACQUELIN ET AL.

No. 73–203.   Argued February 25, 1974—Decided May 28, 1974

158

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Rehnquist, JJ., joined. Douglas, J., filed an opinion dissenting in part, in which Brennan and Marshall, JJ., joined, *post*, p. 179.

*Aaron M. Fine* argued the cause for petitioner. With him on the briefs were *Mordecai Rosenfeld* and *Harold E. Kohn.*

*Devereux Milburn* and *William Eldred Jackson* argued the cause for respondents. With them on the briefs were *Louis L. Stanton, Jr.,* and *Russell E. Brooks.**

*Briefs of *amici curiae* urging reversal were filed by *Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *George D. Zuckerman* and *Arnold D. Fleischer,* Assistant Attorneys General, for the Attorney General of New York; by *Israel Packel,* Attorney General, *Lawrence Silver* and *Gerry J. Elman,* Deputy Attorneys General, and *David Berger* for the Commonwealth of Pennsylvania; by *Evelle J. Younger,* Attorney General, *Anthony C. Joseph,* Assistant Attorney General, and *Michael I. Spiegel,* Deputy Attorney General, for the State of California; by *William J. Baxley,* Attorney General of Alabama, *Norman C. Gorsuch,* Attorney General of Alaska, *Gary K. Nelson,* Attorney General of Arizona, *Arthur K. Bolton,* Attorney General of Georgia, *Ed W. Hancock,* Attorney General of Kentucky, *Robert H. Quinn,* Attorney General, and *Leo Schwartz,* Special Assistant Attorney General of Massachusetts, *John C. Danforth,* Attorney General of Missouri, *Allen I. Olson,* Attorney General of North Dakota, *Richard*

Mr. Justice Powell delivered the opinion of the Court.

On May 2, 1966, petitioner filed a class action on behalf of himself and all other odd-lot [1] traders on the New York Stock Exchange (the Exchange). The complaint charged respondents with violations of the antitrust and securities laws and demanded damages for petitioner and his class. Eight years have elapsed, but there has been no trial on the merits of these claims. Both the parties and the courts are still wrestling with the complex questions surrounding petitioner's attempt to maintain his suit as a class action under Fed. Rule Civ. Proc. 23. We granted certiorari to resolve some of these difficulties. 414 U. S. 908 (1973).

J. Israel, Attorney General of Rhode Island, Kimberly B. Cheney, Attorney General of Vermont, Robert I. Shevin, Attorney General of Florida, Richard C. Turner, Attorney General of Iowa, William J. Guste, Attorney General of Louisiana, A. F. Summer, Attorney General of Mississippi, Louis J. Lefkowitz, Attorney General of New York, Larry Derryberry, Attorney General of Oklahoma, Kermit A. Sande, Attorney General of South Dakota, Andrew P. Miller, Attorney General of Virginia, and David I. Shapiro and James vanR. Springer for the State of Alabama et al.; by Sheldon V. Burman for the New York State Trial Lawyers Assn.; by Edward I. Pollock, Leonard Sacks, and Stephen I. Zetterberg for the California Trial Lawyers Assn.; by Melvin L. Wulf and Burt Neuborne for the American Civil Liberties Union; by Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston, and Eric Schnapper for the NAACP Legal Defense and Educational Fund, Inc.; and by Alan B. Morrison for the Public Citizen and Consumers Union of United States, Inc.

Briefs of amici curiae urging affirmance were filed by William C. Falkenhainer and Rollin E. Woodbury for Southern California Edison Co., and by Samuel E. Gates, Dwight B. Buss, Ralph L. McAfee, Carl J. Schuck, Marvin Schwartz, William Simon, George A. Spiegelberg, and Philip H. Strubing for the American College of Trial Lawyers.

[1] Odd lots are shares traded in lots of fewer than a hundred. Shares traded in units of a hundred or multiples thereof are round-lots.

## I

Petitioner brought this class action in the United States District Court for the Southern District of New York. Originally, he sued on behalf of all buyers and sellers of odd lots on the Exchange, but subsequently the class was limited to those who traded in odd lots during the period from May 1, 1962, through June 30, 1966. 52 F. R. D. 253, 261 (1971). Throughout this period odd-lot trading was not part of the Exchange's regular auction market but was handled exclusively by special odd-lot dealers, who bought and sold for their own accounts as principals. Respondent brokerage firms Carlisle & Jacquelin and DeCoppet & Doremus together handled 99% of the Exchange's odd-lot business. S. E. C., Report of Special Study of Securities Markets, H. R. Doc. No. 95, pt. 2, 88th Cong., 1st Sess., 172 (1963). They were compensated by the odd-lot differential, a surcharge imposed on the odd-lot investor in addition to the standard brokerage commission applicable to round-lot transactions. For the period in question the differential was $\frac{1}{8}$ of a point ($12\frac{1}{2}¢$) per share on stocks trading below $40 per share and $\frac{1}{4}$ of a point (25¢) per share on stocks trading at or above $40 per share.[2]

Petitioner charged that respondent brokerage firms had monopolized odd-lot trading and set the differential at an excessive level in violation of §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1 and 2, and he demanded treble damages for the amount of the overcharge. Petitioner also demanded unspecified money damages from the Exchange for its alleged failure to regulate the differential for the protection of investors in violation of §§ 6 and 19 of the Securities Exchange Act of 1934, 15 U. S. C. §§ 78f and 78s. Finally, he requested attor-

---

[2] On July 1, 1966, the $40 "breakpoint" was raised to $55.

neys' fees and injunctive prohibition of future excessive charges.

A critical fact in this litigation is that petitioner's individual stake in the damages award he seeks is only $70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount. Economic reality dictates that petitioner's suit proceed as a class action or not at all. Opposing counsel have therefore engaged in prolonged combat over the various requirements of Rule 23. The result has been an exceedingly complicated series of decisions by both the District Court and the Court of Appeals for the Second Circuit. To understand the labyrinthian history of this litigation, a preliminary overview of the decisions may prove useful.

In the beginning, the District Court determined that petitioner's suit was not maintainable as a class action. On appeal, the Court of Appeals issued two decisions known popularly as *Eisen I* and *Eisen II*. The first held that the District Court's decision was a final order and thus appealable. In the second the Court of Appeals intimated that petitioner's suit could satisfy the requirements of Rule 23, but it remanded the case to permit the District Court to consider the matter further. After conducting several evidentiary hearings on remand, the District Court decided that the suit could be maintained as a class action and entered orders intended to fulfill the notice requirements of Rule 23. Once again, the case was appealed. The Court of Appeals then issued its decision in *Eisen III* and ended the trilogy by denying class action status to petitioner's suit. We now review these developments in more detail.

## *Eisen I*

As we have seen, petitioner began this action in May 1966. In September of that year the District Court

dismissed the suit as a class action. 41 F. R. D. 147. Following denial of his motion for interlocutory review under 28 U. S. C. § 1292 (b), petitioner took an appeal as of right under § 1291. Respondents then moved to dismiss on the ground that the order appealed from was not final. In *Eisen I,* the Court of Appeals held that the denial of class action status in this case was appealable as a final order under § 1291. 370 F. 2d 119 (1966), cert. denied, 386 U. S. 1035 (1967). This was so because, as a practical matter, the dismissal of the class action aspect of petitioner's suit was a "death knell" for the entire action. The court thought this consequence rendered the order dismissing the class action appealable under *Cohen* v. *Beneficial Loan Corp.,* 337 U. S. 541, 546 (1949).

### Eisen II

Nearly 18 months later the Court of Appeals reversed the dismissal of the class action in a decision known as *Eisen II.* 391 F. 2d 555 (1968). In reaching this result the court undertook an exhaustive but ultimately inconclusive analysis of Rule 23. Subdivision (a) of the Rule sets forth four prerequisites to the maintenance of any suit as a class action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." The District Court had experienced little difficulty in finding that petitioner satisfied the first three prerequisites but had concluded that petitioner might not "fairly and adequately protect the interests of the class" as required by Rule 23 (a)(4). The Court of Appeals indicated its disagreement with the

reasoning behind the latter conclusion and directed the District Court to reconsider the point.

In addition to meeting the four conjunctive requirements of 23 (a), a class action must also qualify under one of the three subdivisions of 23 (b).[3] Petitioner argued that the suit was maintainable as a class action under all three subdivisions. The Court of Appeals held the first two subdivisions inapplicable to this suit[4] and

---

[3] "(b) Class Actions Maintainable.

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

[4] Before the Court of Appeals, petitioner dropped the contention that the suit qualified under subdivision (b)(1)(B). The court held subdivision (b)(1)(A) inapplicable on the ground that the pro-

therefore turned its attention to the third subdivision, (b)(3). That subdivision requires a court to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." More specifically, it identifies four factors relevant to these inquiries. After a detailed review of these provisions, the Court of Appeals concluded that the only potential barrier to maintenance of this suit as a class action was the Rule 23 (b)(3)(D) directive that a court evaluate "the difficulties likely to be encountered in the management of a class action." Commonly referred to as "manageability," this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit. With reference to this litigation, the Court of Appeals noted that the difficulties of distributing any ultimate recovery to the class members would be formidable, though not necessarily insuperable, and commented that it was "reluctant to permit actions to proceed where they are not likely to benefit anyone but the lawyers who bring them." 391 F. 2d, at 567. The Court therefore directed the District Court to conduct "a further inquiry . . . in order to consider the mechanics involved in the administration of the present action." *Ibid.*

---

spective class consisted entirely of small claimants, none of whom could afford to litigate this action in order to recover his individual claim and that consequently there was little chance of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class . . . ." Subdivision (b)(2) was held to apply only to actions exclusively or predominantly for injunctive or declaratory relief. Advisory Committee's Note, Proposed Rules of Civil Procedure, 28 U. S. C. App., p. 7766.

Finally, the Court of Appeals turned to the most imposing obstacle to this class action—the notice requirement of Rule 23 (c)(2). The District Court had held that both the Rule and the Due Process Clause of the Fifth Amendment required individual notice to all class members who could be identified. 41 F. R. D., at 151. Petitioner objected that mailed notice to the entire class would be prohibitively expensive and argued that some form of publication notice would suffice. The Court of Appeals declined to settle this issue, noting that "[o]n the record before us we cannot arrive at any rational and satisfactory conclusion on the propriety of resorting to some form of publication as a means of giving the necessary notice to all members of the class on behalf of whom the action is stated to be commenced and maintained." 391 F. 2d, at 569.

The outcome of *Eisen II* was a remand for an evidentiary hearing on the questions of notice, manageability, adequacy of representation, and "any other matters which the District Court may consider pertinent and proper." *Id.,* at 570. And in a ruling that aroused later controversy, the Court of Appeals expressly purported to retain appellate jurisdiction while the case was heard on remand.

*Eisen III*

After it held the evidentiary hearing on remand, which together with affidavits and stipulations provided the basis for extensive findings of fact, the District Court issued an opinion and order holding the suit maintainable as a class action. 52 F. R. D. 253 (1971). The court first noted that petitioner satisfied the criteria identified by the Court of Appeals for determining adequacy of representation under Rule 23 (a)(4). Then it turned to the more difficult question of manageability. Under this general rubric the court dealt with problems of the com-

putation of damages, the mechanics of administering this suit as a class action, and the distribution of any eventual recovery. The last-named problem had most troubled the Court of Appeals, prompting its remark that if "class members are not likely ever to share in an eventual judgment, we would probably not permit the class action to continue." 391 F. 2d, at 567. The District Court attempted to resolve this difficulty by embracing the idea of a "fluid class" recovery whereby damages would be distributed to future odd-lot traders rather than to the specific class members who were actually injured. The court suggested that "a fund equivalent to the amount of unclaimed damages might be established and the odd-lot differential reduced in an amount determined reasonable by the court until such time as the fund is depleted." 52 F. R. D., at 265. The need to resort to this expedient of recovery by the "next best class" arose from the prohibitively high cost of computing and awarding multitudinous small damages claims on an individual basis.

Finally, the District Court took up the problem of notice. The court found that the prospective class included some six million individuals, institutions, and intermediaries of various sorts; that with reasonable effort some two million of these odd-lot investors could be identified by name and address; [5] and that the names and addresses of an additional 250,000 persons who had participated in special investment programs involving

---

[5] These two million traders dealt with brokerage firms who transmitted their odd-lot transactions to respondents Carlisle & Jacquelin and DeCoppet & Doremus via teletype. By comparing the odd-lot firms' computerized records of these teletype transactions and the general-services brokerage firms' computerized records of all customer names and addresses, the names and addresses of these two million odd-lot traders can be obtained.

odd-lot trading [6] could also be identified with reasonable effort. Using the then current first-class postage rate of six cents, the court determined that stuffing and mailing each individual notice form would cost 10 cents. Thus individual notice to all identifiable class members would cost $225,000,[7] and additional expense would be incurred for suitable publication notice designed to reach the other four million class members.

The District Court concluded, however, that neither Rule 23 (c)(2) nor the Due Process Clause required so substantial an expenditure at the outset of this litigation. Instead, it proposed a notification scheme consisting of four elements: (1) individual notice to all member firms of the Exchange and to commercial banks with large trust departments; (2) individual notice to the approximately 2,000 identifiable class members with 10 or more odd-lot transactions during the relevant period; (3) individual notice to an additional 5,000 class members selected at random; and (4) prominent publication notice in the Wall Street Journal and in other newspapers in New York and California. The court calculated that this package would cost approximately $21,720.

The only issue not resolved by the District Court in its first opinion on remand from *Eisen II* was who should bear the cost of notice. Because petitioner understandably declined to pay $21,720 in order to litigate an action

---

[6] In the period from May 1962 through June 1968, 100,000 individuals had odd-lot transactions through participation in the Monthly Investment Plan operated by the Exchange and 150,000 persons traded in odd lots through participation in a number of payroll deduction plans operated by Merrill Lynch, Pierce, Fenner & Smith,

[7] Adjusting this figure to reflect the subsequent 4¢ increase in first-class postage would yield a figure of $315,000.

involving an individual stake of only $70, this question presented something of a dilemma:

> "If the expense of notice is placed upon [petitioner], it would be the end of a possibly meritorious suit, frustrating both the policy behind private antitrust actions and the admonition that the new Rule 23 is to be given a liberal rather than a restrictive interpretation, Eisen II at 563. On the other hand, if costs were arbitrarily placed upon [respondents] at this point, the result might be the imposition of an unfair burden founded upon a groundless claim. In addition to the probability of encouraging frivolous class actions, such a step might also result in [respondents'] passing on to their customers, including many of the class members in this case, the expenses of defending these actions." 52 F. R. D., at 269.

Analogizing to the laws of preliminary injunctions, the court decided to impose the notice cost on respondents if petitioner could show a strong likelihood of success on the merits, and it scheduled a preliminary hearing on the merits to facilitate this determination. After this hearing the District Court issued an opinion and order ruling that petitioner was "more than likely" to prevail at trial and that respondents should bear 90% of the cost of notice, or $19,548. 54 F. R. D. 565, 567 (1972).

Relying on the purported retention of jurisdiction by the Court of Appeals after *Eisen II,* respondents on May 1, 1972, obtained an order directing the clerk of the District Court to certify and transmit the record for appellate review. Subsequently, respondents also filed a notice of appeal under 28 U. S. C. § 1291. Petitioner's motion to dismiss on the ground that the appeal had not been taken from a final order was denied by the Court of Appeals on June 29, 1972.

On May 1, 1973, the Court of Appeals issued *Eisen III*. 479 F. 2d 1005. The majority disapproved the District Court's partial reliance on publication notice, holding that Rule 23 (c)(2) required individual notice to all identifiable class members. The majority further ruled that the District Court had no authority to conduct a preliminary hearing on the merits for the purpose of allocating costs and that the entire expense of notice necessarily fell on petitioner as representative plaintiff. Finally, the Court of Appeals rejected the expedient of a fluid-class recovery and concluded that the proposed class action was unmanageable under Rule 23 (b)(3)(D). For all of these reasons the Court of Appeals ordered the suit dismissed as a class action. One judge concurred in the result solely on the ground that the District Court had erred in imposing 90% of the notice costs on respondents. Petitioner's requests for rehearing and rehearing en banc were denied. 479 F. 2d, at 1020.

Thus, after six and one-half years and three published decisions, the Court of Appeals endorsed the conclusion reached by the District Court in its original order in 1966—that petitioner's suit could not proceed as a class action. In its procedural history, at least, this litigation has lived up to Judge Lumbard's characterization of it as a "Frankenstein monster posing as a class action." *Eisen II*, 391 F. 2d, at 572.

II

At the outset we must decide whether the Court of Appeals in *Eisen III* had jurisdiction to review the District Court's orders permitting the suit to proceed as a class action and allocating the cost of notice. Petitioner contends that it did not. Respondents counter by asserting two independent bases for appellate jurisdiction: first, that the orders in question constituted a "final"

decision within the meaning of 28 U. S. C. § 1291 [8] and were therefore appealable as of right under that section; and, second, that the Court of Appeals in *Eisen II* expressly retained jurisdiction pending further development of a factual record on remand and that consequently no new jurisdictional basis was required for the decision in *Eisen III*. Because we agree with the first ground asserted by respondents, we have no occasion to consider the second.

Restricting appellate review to "final decisions" prevents the debilitating effect on judicial administration caused by piecemeal appellate disposition of what is, in practical consequence, but a single controversy. While the application of § 1291 in most cases is plain enough, determining the finality of a particular judicial order may pose a close question. No verbal formula yet devised can explain prior finality decisions with unerring accuracy or provide an utterly reliable guide for the future.[9] We know, of course, that § 1291 does not

---

[8] Section 1291 provides:

"The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court."

[9] As long ago as 1892 the Court complained: "Probably no question of equity practice has been the subject of more frequent discussion in this court than the finality of decrees. . . . The cases, it must be conceded, are not altogether harmonious." *McGourkey* v. *Toledo & Ohio R. Co.*, 146 U. S. 536, 544–545. In the intervening years the difficulty of resolving such questions has not abated. As Mr. Justice Black commented in *Gillespie* v. *U. S. Steel Corp.*, 379 U. S. 148, 152 (1964), "whether a ruling is 'final' within the meaning of § 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and . . . it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality."

limit appellate review to "those final judgments which terminate an action . . . ," *Cohen* v. *Beneficial Loan Corp.*, 337 U. S., at 545, but rather that the requirement of finality is to be given a "practical rather than a technical construction." *Id.*, at 546. The inquiry requires some evaluation of the competing considerations underlying all questions of finality—"the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Dickinson* v. *Petroleum Conversion Corp.*, 338 U. S. 507, 511 (1950) (footnote omitted).

We find the instant case controlled by our decision in *Cohen* v. *Beneficial Loan Corp.*, *supra.* There the Court considered the applicability in a federal diversity action of a forum state statute making the plaintiff in a stockholder's derivative action liable for litigation expenses, if ultimately unsuccessful, and entitling the corporation to demand security in advance for their payment. The trial court ruled the statute inapplicable, and the corporation sought immediate appellate review over the stockholder's objection that the order appealed from was not final. This Court held the order appealable on two grounds. First, the District Court's finding was not "tentative, informal or incomplete," 337 U. S., at 546, but settled conclusively the corporation's claim that it was entitled by state law to require the shareholder to post security for costs. Second, the decision did not constitute merely a "step toward final disposition of the merits of the case . . . ." *Ibid.* Rather, it concerned a collateral matter that could not be reviewed effectively on appeal from the final judgment. The Court summarized its conclusion in this way:

"This decision appears to fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action,

too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Ibid.*

Analysis of the instant case reveals that the District Court's order imposing 90% of the notice costs on respondents likewise falls within "that small class." It conclusively rejected respondents' contention that they could not lawfully be required to bear the expense of notice to the members of petitioner's proposed class. Moreover, it involved a collateral matter unrelated to the merits of petitioner's claims. Like the order in *Cohen,* the District Court's judgment on the allocation of notice costs was "a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it," *id.,* at 546–547, and it was similarly appealable as a "final decision" under § 1291. In our view the Court of Appeals therefore had jurisdiction to review fully the District Court's resolution of the class action notice problems in this case, for that court's allocation of 90% of the notice costs to respondents was but one aspect of its effort to construe the requirements of Rule 23 (c)(2) in a way that would permit petitioner's suit to proceed as a class action.[10]

## III

Turning to the merits of the case, we find that the District Court's resolution of the notice problems was

---

[10] As explained in Part III of this opinion, we find the notice requirements of Rule 23 to be dispositive of petitioner's attempt to maintain the class action as presently defined. We therefore have no occasion to consider whether the Court of Appeals correctly resolved the issues of manageability and fluid-class recovery, or indeed, whether those issues were properly before the Court of Appeals under the theory of retained jurisdiction.

erroneous in two respects. First, it failed to comply with the notice requirements of Rule 23 (c)(2), and second, it imposed part of the cost of notice on respondents.

## A

Rule 23 (c)(2) provides that, in any class action maintained under subdivision (b)(3), each class member shall be advised that he has the right to exclude himself from the action on request or to enter an appearance through counsel, and further that the judgment, whether favorable or not, will bind all class members not requesting exclusion. To this end, the court is required to direct to class members "the best notice practicable under the circumstances, *including individual notice to all members who can be identified through reasonable effort.*" [11] We think the import of this language is unmistakable. Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort.

The Advisory Committee's Note to Rule 23 reinforces this conclusion. See 28 U. S. C. App., p. 7765. The Advisory Committee described subdivision (c)(2) as "not merely discretionary" and added that the "mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject." *Id.,* at 7768. The

---

[11] Emphasis added. Subdivision (c)(2) provides in full: "(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel."

Committee explicated its incorporation of due process standards by citation to *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306 (1950), and like cases.

In *Mullane* the Court addressed the constitutional sufficiency of publication notice rather than mailed individual notice to known beneficiaries of a common trust fund as part of a judicial settlement of accounts. The Court observed that notice and an opportunity to be heard were fundamental requisites of the constitutional guarantee of procedural due process. It further stated that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.*, at 314. The Court continued:

> "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonbly certain to inform those affected." *Id.*, at 315.

The Court then held that publication notice could not satisfy due process where the names and addresses of the beneficiaries were known.[12] In such cases, "the reasons

---

[12] The Court's discussion of the inadequacies of published notice bears attention:

"It would be idle to pretend that publication alone, as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts. . . . Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed. The chance of actual notice is further reduced when, as here, the

disappear for resort to means less likely than the mails to apprise them of [an action's] pendency." *Id.*, at 318.

In *Schroeder* v. *City of New York,* 371 U. S. 208 (1962), decided prior to the promulgation of amended Rule 23, the Court explained that *Mullane* required rejection of notice by publication where the name and address of the affected person were available. The Court stated that the "general rule" is that "notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable . . . ." *Id.*, at 212–213. The Court also noted that notice by publication had long been recognized as a poor substitute for actual notice and that its justification was " 'difficult at best.' " *Id.*, at 213.

Viewed in this context, the express language and intent of Rule 23 (c)(2) leave no doubt that individual notice must be provided to those class members who are identifiable through reasonable effort. In the present case, the names and addresses of 2,250,000 class members are easily ascertainable, and there is nothing to show that individual notice cannot be mailed to each. For these class members, individual notice is clearly the "best notice practicable" within the meaning of Rule 23 (c)(2) and our prior decisions.

Petitioner contends, however, that we should dispense with the requirement of individual notice in this case, and he advances two reasons for our doing so. First, the prohibitively high cost of providing individual notice to 2,250,000 class members would end this suit as a class action and effectively frustrate petitioner's attempt to vindicate the policies underlying the antitrust and se-

notice required does not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention." 339 U. S., at 315.

curities laws.    Second, petitioner contends that individual notice is unnecessary in this case, because no prospective class member has a large enough stake in the matter to justify separate litigation of his individual claim.    Hence, class members lack any incentive to opt out of the class action even if notified.

The short answer to these arguments is that individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case.    It is, rather, an unambiguous requirement of Rule 23.    As the Advisory Committee's. Note explained, the Rule was intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit.    28 U. S. C. App., pp. 7765, 7768. Accordingly, each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may remain in the class and perhaps participate in the management of the action.    There is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs.[13]

Petitioner further contends that adequate representation, rather than notice, is the touchstone of due process in a class action and therefore satisfies Rule 23.    We think this view has little to commend it.    To begin with, Rule 23 speaks to notice as well as to adequacy of representation and requires that both be provided.    Moreover, petitioner's argument proves too much, for it

---

[13] Petitioner also argues that class members will not opt out because the statute of limitations has long since run out on the claims of all class members other than petitioner.    This contention is disposed of by our recent decision in *American Pipe & Construction Co.* v. *Utah,* 414 U. S. 538 (1974), which established that commencement of a class action tolls the applicable statute of limitations as to all members of the class.

quickly leads to the conclusion that no notice at all, published or otherwise, would be required in the present case. This cannot be so, for quite apart from what due process may require, the command of Rule 23 is clearly to the contrary. We therefore conclude that Rule 23 (c) (2) requires that individual notice be sent to all class members who can be identified with reasonable effort.[14]

## B

We also agree with the Court of Appeals that petitioner must bear the cost of notice to the members of his class. The District Court reached the contrary conclusion and imposed 90% of the notice cost on respondents. This decision was predicated on the court's finding, made after a preliminary hearing on the merits of the case, that petitioner was "more than likely" to prevail on his claims. Apparently, that court interpreted Rule 23 to authorize such a hearing as part of the determination whether a suit may be maintained as a class action. We disagree.

We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it. He is thereby allowed to obtain a determination on the merits of the claims advanced on

---

[14] We are concerned here only with the notice requirements of subdivision (c) (2), which are applicable to class actions maintained under subdivision (b) (3). By its terms subdivision (c) (2) is inapplicable to class actions for injunctive or declaratory relief maintained under subdivision (b) (2). Petitioner's effort to qualify his suit as a class action under subdivisions (b) (1) and (b) (2) was rejected by the Court of Appeals. See n. 4, *supra*.

behalf of the class without any assurance that a class action may be maintained. This procedure is directly contrary to the command of subdivision (c)(1) that the court determine whether a suit denominated a class action may be maintained as such "[a]s soon as practicable after the commencement of [the] action . . . ." In short, we agree with Judge Wisdom's conclusion in *Miller* v. *Mackey International*, 452 F. 2d 424 (CA5 1971), where the court rejected a preliminary inquiry into the merits of a proposed class action:

> "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.,* at 427.

Additionally, we might note that a preliminary determination of the merits may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials. The court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant.

In the absence of any support under Rule 23, petitioner's effort to impose the cost of notice on respondents must fail. The usual rule is that a plaintiff must initially bear the cost of notice to the class. The exceptions cited by the District Court related to situations where a fiduciary duty pre-existed between the plaintiff and defendant, as in a shareholder derivative suit.[15] Where, as here, the relationship between the parties is truly ad-

---

[15] See, *e. g., Dolgow* v. *Anderson*, 43 F. R. D. 472, 498–500 (EDNY 1968). We, of course, express no opinion on the proper allocation of the cost of notice in such cases.

versary, the plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit.

Petitioner has consistently maintained, however, that he will not bear the cost of notice under subdivision (c) (2) to members of the class as defined in his original complaint. See 479 F. 2d, at 1008; 52 F. R. D., at 269. We therefore remand the cause with instructions to dismiss the class action as so defined.[16]

The judgment of the Court of Appeals is vacated and the cause remanded for proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Douglas, with whom Mr. Justice Brennan and Mr. Justice Marshall concur, dissenting in part.

While I am in general agreement with the phases of this case touched on by the Court, I add a few words because its opinion does not fully explore the issues which will be dispositive of this case on remand to the District Court.

Federal Rule Civ. Proc. 23 (c)(4) provides: "When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

---

[16] The record does not reveal whether a smaller class of odd-lot traders could be defined, and if so, whether petitioner would be willing to pay the cost of notice to members of such a class. We intimate no view on whether any such subclass would satisfy the requirements of Rule 23. We do note, however, that our dismissal of the class action as originally defined is without prejudice to any efforts petitioner may make to redefine his class either under Rule 23 (c)(4) or Fed. Rule Civ. Proc. 15.

As Judge Oakes, speaking for himself and Judge Timbers, said below:

"The plaintiff class might, for example, be divided into much smaller subclasses ... of odd lot buyers for particular periods, and one subclass treated as a test case, with the other subclasses held in abeyance. Individual notice at what would probably be a reasonable cost could then be given to all members of the particular small subclass who can be easily identified." 479 F. 2d 1005, 1023 (dissenting from denial of rehearing en banc).

Or a subclass might include those on monthly investment plans, or payroll deduction plans run by brokerage houses.[1] The possibilities, though not infinite, are numerous.

---

[1] The parties and courts below concentrated on whether a class action could be sustained on behalf of all six million odd-lot investors, so that the record is limited in information bearing on what manageable subclasses could be created.

There is, nonetheless, indication that certain subclasses might be economically manageable. Counsel for respondent Carlisle & Jacquelin stated in oral argument before the Court of Appeals that 100,000 shareholders participate in his client's Monthly Investment Plan, and that Carlisle & Jacquelin corresponds with those investors. Merrill Lynch corresponds with 150,000 people participating in a payroll deduction investment plan. Whether Eisen or any other plaintiff who may come forward to intervene fits in such a subclass, we do not know. But if brokerage houses correspond regularly in the course of business with such odd-lot investors, the marginal cost of providing the individual notice required by Rule 23 (c) (2) might be nothing more than printing and stuffing an additional sheet of paper in correspondence already being sent to the investor, or perhaps only programing a computer to type an additional paragraph at the bottom of monthly or quarterly statements regularly mailed by the brokers.

A subclass of those who had engaged in numerous transactions might also be defined, so that the recovery per class member might be large enough to justify the cost of notice and management of the

The power to create a subclass is clear and unambiguous. Who should be included and how large it should be are questions that only the District Court should resolve. Notice to each member of the subclass would be essential under Rule 23 (c)(2); and under Rule 23 (c)(2)(A) any notified member may opt out. There would remain the question whether the subclass suit is manageable. But since the subclass could be chosen in light of the nonmanageability of the size of the class whose claims are presently before us, there is no apparent difficulty in that sense.

The statute of limitations, it is argued, has run or is about to run on many of these classes. We held in *American Pipe & Construction Co.* v. *Utah,* 414 U. S. 538, that the start of a class action prior to the running of the statute protects all members of the class. Whether that rule should obtain for the benefit of other members who could have been included in the subclass bringing suit, but for the manageability issue, is a question we have not decided.[2] Moreover, if the subclass sues and wins or

action. A survey of only four of 14 wire firms revealed 2,000 customers with 10 or more transactions between 1962 and 1966. 52 F. R. D. 253, 259, 267, and n. 10.

By defining more definite subclasses such as those discussed, moreover, the problems inherent in distributing an eventual judgment would be reduced. Class members would be more readily identifiable, with more readily accessible transaction records and individually provable damages.

[2] In this case, the entire class was defined in the original complaint, and the defendants were put on notice within the period of limitation of their potential liability, serving the purpose of the statute of limitations even if the substantive merits were eventually to be prosecuted in the form of a subclass action with the class action held in abeyance. "Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional inter-

sues and loses, questions covering the rights of members of the larger class who are not parties would be raised. These are questions we have not answered.[3] But the fact that unresolved questions of law would remain is not an insurmountable obstacle, and Rule 23 (c)(4)(B) expressly authorizes subclasses to sue in lieu of a full class. Rule 23 (c)(4)(B) may have had, as a forerunner, the proposal stated by Judge Weinstein in 1960:

> "When there is a question of law or fact common to persons of a numerous class whose joinder is impracticable, one or more of them whose claims or defenses are representative of the claims or defenses of all and who will fairly and adequately protect the interests of all may sue or be sued on behalf of all." [4]

In explanation he added:

> "Such a rule would provide six requirements for a class action: (1) a class, (2) numerous members,

venors." *American Pipe & Construction Co.* v. *Utah*, 414 U. S. 538, 555. And see Wheaton, Representative Suits Involving Numerous Litigants, 19 Cornell L. Q. 399, 423 (1934).

[3] If the subclass lost, it is argued that other investors not members of that subclass could not be precluded from prosecuting successful suits of their own, since they had never had their day in court or necessarily even been apprised of the subclass' action. See *Hansberry* v. *Lee*, 311 U. S. 32; F. James, Civil Procedure § 11.26 (1965); 1B J. Moore, Federal Practice ¶ 0.411 [1] (1974). If the subclass won, strict application of the doctrine of mutuality of estoppel would limit the usefulness of that subclass victory in suits brought by investors not members of that subclass. See generally F. James, *supra*, § 11.31; 1B J. Moore, *supra*, ¶ 0.412 [1] (and Supp. 1973), and cases cited therein. And see Vestal, Preclusion/Res Judicata Variables: Parties, 50 Iowa L. Rev. 27, 55–59 (1964); Note, 35 Geo. Wash. L. Rev. 1010 (1967); Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan. L. Rev. 281 (1957).

[4] Weinstein, Revision of Procedure: Some Problems in Class Actions, 9 Buffalo L. Rev. 433, 458.

(3) common question of law or fact, (4) impracticability of joinder, (5) representative claim or defense, (6) fair and adequate protection of absentees.

"Almost any 'bond of association' in an event or status out of which a legal dispute arose is sufficient to constitute a class. The class must be numerous but need not be so large that, in itself, this factor makes it impracticable to bring them all before the court. A number of members sufficient to satisfy present Section 195 [of the New York Civil Practice Act] would satisfy the proposed rule. Size, modesty of monetary interest, inability to locate members and difficulty of obtaining jurisdiction should all be considered in determining impracticability of joinder." [5]

The Court permits Eisen to redefine his class either by amending his complaint pursuant to Fed. Rule Civ. Proc. 15, or by proceeding under Rule 23 (c)(4). While Eisen may of course proceed by amending his complaint to define a subclass, it is clear that he need not do so.[6] Definition of the subclass would properly be accomplished by order of the District Court, as permitted by Rules 23 (c)(4) and 23 (c)(1), without amendment of the complaint as filed. While the complaint alleges that

---

[5] *Id.*, at 458–459 (footnotes omitted).

[6] Were Eisen to be remitted to an individual action, as he would be if he refused to pay the cost of notice even to a subclass, amendment of the complaint might be called for by the District Court. Under Rule 23 (d)(4), the District Court may in some instances require that pleadings be amended to eliminate class allegations. The Advisory Committee Notes indicate that this provision is to be applied only when a suit must proceed as a nonclass, individual action, not when, as here, an appropriate class exists and the action must be prosecuted in the first instance by a subclass only because of problems of manageability. See 28 U. S. C. App., p. 7767.

Eisen sues on his behalf and on behalf of all purchasers and sellers of odd lots, it adds, "Plaintiff will fairly insure the adequate representation of all such persons." Problems of manageability covered by Rule 23 (b)(3)(D) arise only after issues are joined and the District Court is engaged in shaping up the litigation for a trial on the merits. If it finds that a subclass would be more appropriate, no new action need be started nor any amended complaint filed.

Rule 23 (c)(1) provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

It is as plain as words can make it that the court which decides that a full class action can be maintained can alter or amend its order "before the decision on the merits." One permissible way in which the court's order may be changed is to have it "altered" as provided in Rule 23 (c)(1) by reducing the larger class to a subclass as provided in the same subsection—Rule 23 (c) (4)(B). The prerequisites of a class cause of action are described in Rule 23 (a). In the instant case that hurdle has been passed and we are at the stage of notice requirements and manageability. Not an iota of change is made in the cause of action by restricting it to a subclass.

The purpose of Rule 23 is to provide flexibility in the management of class actions, with the trial court taking an active role in the conduct of the litigation. See *Dolgow* v. *Anderson*, 43 F. R. D. 472, 481–482 (EDNY); *Green* v. *Wolf Corp.*, 406 F. 2d 291, 298 (CA2), cert. denied, 395 U. S. 977. Lower federal courts have recognized their discretion to define those subclasses proper to prosecute an action without being bound by the plaintiff's

complaint. See, *e. g., Dolgow* v. *Anderson, supra,* at 491–493; *Philadelphia Elec. Co.* v. *Anaconda American Brass Co.,* 43 F. R. D. 452, 462–463 (ED Pa.). See generally 7A C. Wright & A. Miller, Federal Practice and Procedure § 1790, p. 187; 3B J. Moore, Federal Practice ¶ 23.65. And, as Rule 23 (c)(1) clearly indicates, the courts retain both the power and the duty to realign classes during the conduct of an action when appropriate. See, *e. g., Carr* v. *Conoco Plastics, Inc.,* 423 F. 2d 57, 58 (CA5), cert. denied, 400 U. S. 951; *Johnson* v. *ITT-Thompson Industries, Inc.,* 323 F. Supp. 1258, 1262 (ND Miss.); *Ostapowicz* v. *Johnson Bronze Co.,* 54 F. R. D. 465, 466 (WD Pa.); *Baxter* v. *Savannah Sugar Refining Corp.,* 46 F. R. D. 56, 60 (SD Ga.). That discretion can be fully retained only if the full-class complaint is preserved when a subclass is defined to prosecute the action. The bounds of the subclass can then be narrowed or widened by order of the District Court as provided in Rule 23 (c)(1), without need to amend the complaint and without the constraints which might exist if the complaint had earlier been amended pursuant to Rule 15 to include only the subclass.

I agree with Professor Chafee that a class action serves not only the convenience of the parties but also prompt, efficient judicial administration.[7] I think in our society that is growing in complexity there are bound to be innumerable people in common disasters, calamities, or ventures who would go begging for justice without the class action but who could with all regard to due process be protected by it. Some of these are consumers whose claims may seem *de minimis* but who alone have no practical recourse for either remuneration or injunctive relief. Some may be environmentalists who have no photographic development plant about to be ruined because of

---

[7] Z. Chafee, Some Problems of Equity 149 (1950).

air pollution by radiation but who suffer perceptibly by smoke, noxious gases, or radiation. Or the unnamed individual may be only a ratepayer being excessively charged by a utility, or a homeowner whose assessment is slowly rising beyond his ability to pay.

The class action is one of the few legal remedies the small claimant has against those who command the status quo.[8] I would strengthen his hand with the view of creating a system of law that dispenses justice to the lowly as well as to those liberally endowed with power and wealth.

---

[8] Judge Weinstein writing in the N. Y. Law Journal, May 2, 1972, p. 4, col. 3, said:

"Where, however, public authorities are remiss in performance of this responsibility for reason of inadequate legal authority, excessive workloads or simple indifference, class actions may provide a necessary temporary measure until desirable corrections have occurred. The existence of class action litigation may also play a substantial role in bringing about more efficient administrative enforcement and in inducing legislative action.

"The matter touches on the issue of the credibility of our judicial system. Either we are committed to make reasonable efforts to provide a forum for adjudication of disputes involving all our citizens—including those deprived of human rights, consumers who overpay for products because of antitrust violations and investors who are victimized by insider trading or misleading information—or we are not. There are those who will not ignore the irony of courts ready to imprison a man who steals some goods in interstate commerce while unwilling to grant a civil remedy against the corporation which has benefited, to the extent of many millions of dollars, from collusive, illegal pricing of its goods to the public.

"When the organization of a modern society, such as ours, affords the possibility of illegal behavior accompanied by widespread, diffuse consequences, some procedural means must exist to remedy—or at least to deter—that conduct."