In re HEALTH MANAGEMENT, INC., Securities Litigation

No. CV 96–889 ADS.

United States District Court, E.D. New York.

Jan. 23, 1999.

Kaplan, Kilsheimer & Fox LLP, by Frederic S. Fox, Joel B. Strauss, Janine R. Azriliant, of counsel, New York City, Zwerling, Schacter & Zwerling, LLP, by Jeffrey C. Zwerling, of counsel, New York City, for plaintiffs.

Willkie Farr & Gallagher, by Michael R. Young, Alison M. Lehr, of counsel, New York City, Edwards & Angell, by Ira G. Greenberg, of counsel, New York City, for defendant BDO Seidman, LLP.

Reed Smith Shaw & McClay, by Efrem M. Grail, W. Thomas McGough, Jr., Richard J. DeMarco, Jr., of counsel, Pittsburgh, PA, for defendants Irwin Hirsh and Lloyd N. Myers.

Wolf & Wolf, by Edward Wolf, of counsel, Hauppauge, NY, for defendant Clifford E. Hotte.

Poli & Lamura, by John G. Poli, Barry J. Casper, Lawrence Kushnick, of counsel, Northport, NY, for defendant Virginia Belloise.

Sullivan & Gallion, by Edward R. Gallion, of counsel, New York City, for defendant Drew W. Bergman.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This action arises from a consolidated amended complaint (the "complaint") by the plaintiffs on behalf of all persons who purchased the common stock of Health Management, Inc. ("Health Management") from August 25, 1994 through February 27, 1996 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) ("Section 10[b]" and "Section 20[a]", respectively), and Rule 10b–5 promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5 ("Rule 10b–5"), against Health Management, its outside auditor, BDO Seidman, LLP ("BDO"), and certain of its officers and/or directors—specifically, Irwin Hirsh ("Hirsh"), Lloyd N. Myers ("Myers"), Clifford E. Hotte ("Hotte"), Drew W. Bergman ("Bergman"), and Virginia Belloise ("Belloise") (collectively, the "Individual Defendants").

By a Final Judgment and Order of Partial Dismissal of Action dated June 9, 1997, this action was dismissed as to Health Management.

At issue is the plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23,

which is opposed, in part, by the defendants BDO, Hirsh and Myers.

## I. BACKGROUND

Familiarity with the Court's prior decisions is presumed, and will not be reiterated here. Briefly stated, the background of this case is as follows.

### A. Health Management

The following facts are derived from the complaint. Health Management is a Delaware Corporation with its principal executive offices located in Holbrook, New York. The Company is engaged in the business of providing integrated health management services to individuals suffering from chronic medical conditions, and to various health care professionals, drug manufacturers, and third-party payers involved in the care of such patients. The Company offers such services as distribution of prescription drugs, drug utilization review, patient compliance monitoring, and other services. Health Management's common stock are listed and traded on the NASDAQ under the symbol "HMIS."

Health Management has purportedly grown rapidly since its shift in 1989 from the general home healthcare market to the specialized field of chronic disease management. The plaintiffs allege that converting increasing revenues and earnings to cash proved to be a daunting task for Health Management and as a result, prior to the commencement of the Class Period, Health Management began to experience increasing difficulty collecting payment for its enhanced services, which resulted in ballooning accounts receivable and days sales outstanding ("DSO"), the average number of days that a receivable remains outstanding prior to collection. Faced with these pressing concerns, Health Management embarked on an aggressive acquisition strategy designed to improve Health Management's balance sheet by acquiring complimentary companies with lower DSO levels in order to generate cash flow. The plaintiffs allege that because Health Management lacked resources to · acquire these businesses, it was forced to use its common stock to fund many of these acquisitions. Health Management soon recognized that its acquisition strategy would fail unless it was able to support the value of its stock. In addition, Health Management made certain loans from Chemical Bank by the terms of which disappointing earnings report falling below prevailing analyst expectations would place Health Management in default.

### B. The Defendants

The defendants in the alleged fraudulent scheme include the individual defendants, noted at the outset, and BDO, Health Management's outside auditor. Set forth in the complaint is each defendant's relationship to Health Management, which are as follows.

*Hotte,* the founder of Health Management in 1986, was the President and Chairman of the Board of Directors of Health Management. He was the second largest shareholder of Health Management. As of September 20, 1995, Hotte owned or controlled in excess of 1.1 million shares of Health Management common stock, which is approximately 11.4% of the outstanding common stock, including shares held in the name of his wife, co-defendant Belloise, and shares subject to exercisable options. Hotte is alleged to have signed: (1) Health Management's Form 10–Q for the first three quarters of Fiscal 1995; (2) the statement in the letter to shareholders dated December 18, 1994; (3) the statement contained in the 1995 Form 10–K; (4) the statement contained in Health Management's letter to shareholders dated August 5, 1995; and (5) Health Management's Form 10–Q for the first two quarters of Fiscal 1996.

*Belloise* was a member of Health Management's Board of Directors and also served as its Secretary from March 1988 to December 1993. Belloise is alleged to have signed the 1995 Form 10–K.

*Bergman* was Corporate Development Officer, Treasurer and Secretary of Health Management, as well as a member of Health Management's Board of Directors. From approximately June 1995 through December 21, 1995, Bergman served as Chief Financial Officer and Principal Accounting Officer of Health Management. As of September 20, 1995, Bergman owned or controlled 25,667

shares of Health Management common stock, including shares subject to exercisable options. Bergman is alleged to have signed: (1) Health Management's Form 10–Q for the first three quarters of Fiscal 1995; (2) the statement contained in the 1995 Form 10–K; and (3) Health Management's Form 10–Q for the first two quarters of Fiscal 1996.

*Myers* served as Vice President and principal of both Murray Pharmacy, Inc., and Murray Pharmacy Too, Inc. (collectively, the "Murray Group"). On or about April 1, 1994, Health Management acquired substantially all of the net assets of the Murray Group. By virtue of this transaction, and subsequent to July 24, 1995, Myers became Vice President for Sales and Marketing of Health Management. In addition, since March 1994, Myers served as Vice President for Program Development of Health Management's wholly owned subsidiary, HMI Pennsylvania. Further, as a result of the acquisition, by September 20, 1995, Myers owned or controlled more than 3.3% of Health Management's outstanding common stock.

*Hirsh* served with Myers as principal of the Murray Group. After Health Management's acquisition of the Murray Group, Hirsh became Vice President for Purchasing and Managed Care Contracts of HMI Pennsylvania. In addition, by September 20, 1995, Hirsh exercised control or ownership of more than 3.3% of Health Management's outstanding common stock.

## C. The Alleged Fraudulent Scheme

The complaint sets forth the plaintiffs' claims under the federal securities laws for materially false and misleading statements and omissions disseminated by the individual defendants during the Class Period. These alleged materially false and misleading statements allegedly caused the price of Health Management common stock to be artificially inflated during the Class Period, allowing Health Management to complete a number of business acquisitions and for the individual defendants to profit from the artificially inflated value of their personal holdings of Health Management common stock.

Specifically, the Individual Defendants are alleged to have performed the following acts, among others, to artificially inflate Health Management's financial reports:

1.  the inclusion of severely delinquent, uncollectible and, in some cases, fictitious accounts receivables on Health Management's financial statements throughout the Class Period;

2.  the inclusion of fictitious "in-transit" inventory on Health Management's balance sheet for its fiscal year ending April 30, 1995 ("Fiscal 1995"), thereby inflating Health Management's Fiscal 1995 earnings by decreasing its cost of goods sold during the applicable reporting period;

3.  the inclusion of inventory on Health Management's balance sheet for the second fiscal quarter of the fiscal year ending April 30, 1996 ("Fiscal 1996"), for which invoices were received but not recorded as accrued payables until after the applicable reporting period, which inflated Health Management's earning's by decreasing its cost of goods sold during the applicable reporting period; and

4.  the inclusion of cash received after the end of Fiscal 1995 and the first two quarters of Fiscal 1996, as if these sums had been received during the applicable reporting periods, thereby artificially inflating Health Management's cash balances and artificially decreasing levels of DSO.

Allegedly, BDO participated in the fraud by overstating Health Management's financial condition in its Form 10–K for the 1995 fiscal year.

According to the complaint, the fraudulent scheme continued through the first two quarters of Fiscal 1996, during which time the net income was overstated by more than 116%. The investment community reacted positively to these optimistic financial results. However, the alleged fraudulent scheme began to unravel on February 23, 1996 when Health Management announced that it had "discovered certain accounting irregularities" and that a restatement was possible. By March 1996, BDO withdrew its opinion of Health Management's financial results for Fiscal

1995. Consequently, Health Management restated its results for each quarter of Fiscal 1995 and the first two quarters of Fiscal 1996.

### D. The Lead Plaintiffs

By Order dated August 7, 1996, this Court certified plaintiffs Charles T. Labozzetta, Charles Dilustro, Kurt W. Grimm, Michael Zurkan, Bharat Dave, John Capazzi, Albert Buthman, Thomas Druetzler, Lillian Pfaender, Lewis Steven Cohen and Kenneth Holmes as Lead Plaintiffs (the "Lead Plaintiffs"). Under Section 27(a)(3)(B)(iii) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), there exists a presumption that the Lead Plaintiffs: (1) have the largest financial interest in the relief sought by the class; and (2) otherwise satisfy the requirements of Fed.R.Civ.P. 23.

### E. The Court's Prior Decision

In a Decision and Order dated July 21, 1997, this Court denied the Rule 12(b)(6) motions to dismiss by the complaint by BDO and Hotte. However, in *In re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192 (E.D.N.Y.1997), the Court granted the defendant Belloise's motion pursuant to Rule 12(b)(6) to dismiss Count I of the complaint for failure to state a claim upon which relief can be granted, and denied the motion with respect to Count II of the complaint. Finally, the Court denied the motion by Hirsh and Myers for a more definitive statement pursuant to Rules 9(b) and 12(e).

## II. DISCUSSION

### A. The Plaintiffs' Motion for Class Certification

The Lead Plaintiffs seek certification of a class consisting of all persons and entities who purchased the securities of Health Management during the period from August 25, 1994 through February 27, 1996 (the "Class Period"), and were damaged thereby. The proposed starting date of August 25, 1994 represents the "day the Company announced its [quarterly] earnings results for fiscal 1995" (Complaint, ¶34). The proposed class period extends through February 27, 1996,

the date when Health Management announced "that it had discovered certain accounting irregularities." (Complaint, ¶119). Excluded from the Class are: the defendants; members of the immediate families of the Individual Defendants; parents, subsidiaries, affiliates, partners, officers and directors of Health Management or BDO; and the legal representatives, heirs, successors or assigns of any such excluded party.

The defendants Hotte, Bergman and Belloise do not oppose the plaintiffs' motion. The defendants Hirsh, Myers and BDO also do not oppose class certification, but object to the length of the class period, and insist that it should be shorter.

Instead of the plaintiffs' proposed start date of August 25, 1994, BDO suggests a class period commencing on July 31, 1995, the date when it insists that Health Management's Form 10–K was filed, although the complaint alleges that the filing occurred on July 29, 1995. In this regard, BDO points out that Health Management's "Form 10–K, the only SEC filing to contain BDO's allegedly-fraudulent audit report" had not even been filed at the proposed commencement of the Class Period on August 25, 1994. From this, BDO infers that purchasers during the eleven months from August 24, 1994 through July 31, 1995 "plead no claim against BDO." (BDO's Mem., at 2). BDO further requests that the Class period end on February 22, 1996, the day before Health Management "unexpectedly announced that a *'material'* write-down of assets would occur, and that a Special Committee of the Board had been formed to review certain financial and accounting matters." (Complaint, ¶118). According to BDO, it would be appropriate to close the Class Period on February 22, 1996, rather than the plaintiffs' proposed date of February 27, 1996, because "anyone who purchased after the February 23 announcements would be in a position dramatically different than those who purchased before these announcements." (BDO's Mem., at 5).

In a similar vein, defendants Hirsh and Myers object to the proposed class period, and ask the Court to create a sub-class of these defendants, with a class period beginning on June 15, 1995 (rather than August

25, 1994), the date when Health Management issued a press release regarding the company's Fiscal 1995 earnings. According to Hirsh and Myers, they could not be held liable prior to that date because the complaint does not allege that Hirsh or Myers had any actual knowledge of and/or participation in any specific fraudulent conduct until on or about June 9, 1995, when defendant Hotte convened a meeting at which the "Fictitious In–Transit Inventory" was discussed (Complaint, at ¶ 72). According to the Complaint, Myers attended the meeting (Complaint, ¶ 74) and Hirsh was instructed to help execute the plan via a telephone call from defendant Bergman (Complaint, ¶ 76). Thus, it is argued, "As Plaintiffs do not allege such involvement, knowledge or role on the part of Messrs. Myers and Hirsh until June 9, 1995, the class period should not begin as to them until the issuance of the first statement in which they were allegedly 'involved': June 15, 1995." (Myers and Hirsh Mem., at 7). Hirsh and Myers also join in the opposition of BDO with respect to the date on which the class period is to terminate, and assert that the class period should end on February 22, 1996.

### B. Determining the Class Period: The Standard

As noted above, the defendants do not directly contest the plaintiffs' motion for class certification under Rule 23, and instead assert that the proposed class period is improper, because they cannot be held liable for the losses sustained by the plaintiffs, if any, during the entire period proposed by the plaintiffs. The Court disagrees.

The defendants' proposal to limit the time period of the action is based on their theories that Hirsh and Myers cannot be held liable prior to the June 9, 1995 meeting in Hotte's office; that BDO cannot be held liable prior to the July 31, 1995 date when Health Management's Form 10–K was filed; and that none of them can be held liable after Health Management's February 22, 1996 announcement, which assertedly cured the earlier alleged misrepresentations.

In the Court's view, the defendants' assertions raise factual questions which are inap-propriate grounds for limiting the proposed period of class certification. As the Supreme Court stated in the landmark case of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974):

> [w]e find nothing in either the language or the history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.

As the Second Circuit has said in interpreting *Eisen*, it is *"improper for a district court to resolve substantial questions of fact going to the merits when deciding the scope or time limits of a class." Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 572 (2d Cir.1982) (emphasis added), *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80, *and cert. denied*, 459 U.S. 908, 103 S.Ct. 213, 74 L.Ed.2d 170 (1982).

From a reading of these cases, it becomes clear that "This Court will not inquire into the merits of this case by determining which statements [and actions by the defendants] actually opened the door to litigation and which slammed the door shut." *Bharucha v. Reuters Holdings*, No. 90 CV 3838, 1993 WL 657863 (E.D.N.Y. October 29, 1993); *see also In re Frontier Ins. Group, Inc. Securities Litigation*, 172 F.R.D. 31, 43 (E.D.N.Y.1997) ("To decide whether the dates of Tuchman's stock purchase bar her recovery, the court would have to determine when defendants' duty to disclose developed. That is a question concerning the merits of the case. An inquiry into the merits is inappropriate on a motion for class certification."); *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y.1993) ("The court declines to rule on the factual issue of whether there had been a proper curative disclosure . . . [and] will certify the broader class period"). Instead, in this case, the more inclusive class period will be certified, namely, August 25, 1994, through February 27, 1996. "[A] jury can determine which statements, if any, they find actionable and therefore which plaintiffs, if any, can recover from [which d]efendants." *Bharucha v. Reuters Holdings*, No. 90 CV 3838, 1993 WL 657863.

The Court declines to follow the principal case cited by the defendants, *Aboudi v. Daroff*, 65 F.R.D. 388 (S.D.N.Y.1974), a Rule 10b–5 class action brought by the buyer of securities against, among others, the auditor for the corporation, the price of whose securities was allegedly artificially inflated due to the dissemination of false and misleading reports. The district court held that no class would be allowed to proceed against the auditor that included persons who purchased securities before the date on which the first figures certified by the auditor were made public. *Id.* at 393. The Court declines to follow this dated case, which was decided several months after the Supreme Court's seminal decision in *Eisen*, yet, strangely, makes no mention of it.

Finally, "[i]f, as the record develops, the undisputed evidence confirms all or part of the defendant[s'] contentions that the class period should be limited, [they] may move for appropriate relief by a motion for partial summary judgment or otherwise. The present ruling is without prejudice to such a possibility." *Robbins v. Moore Medical Corp.*, No. 91 Civ. 3701, 1992 WL 396423 (S.D.N.Y. Dec. 21, 1992).

## C. Rule 23 Requirements

Finally, although the defendants do not challenge the plaintiffs' allegations that they fulfilled the requirements of Rule 23(a) and (b) within the Class Period, a class can only be certified if it does fulfill these requirements. In this regard, the Court determines that the standards of Rule 23(a) have been satisfied, namely: (1) numerosity; (2) commonality; (3) typicality; and (4) fair and adequate representation. The Court also finds that the standards of Rule 23(b) have been met, since the plaintiffs have shown that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.Pro. 23(b).

## III. CONCLUSION

Having reviewed the parties' submissions, heard oral argument and for the reasons set forth above, it is hereby

**ORDERED,** that the plaintiffs' motion for class certification is granted in its entirety.

**SO ORDERED.**