Elizabeth A. HASTINGS–MURTAGH and Larry Schulte, on their own behalf and on behalf of all other employee-common stockholders similarly situated and on their own behalf and on behalf of all other 20% participating preferred stockholders similarly situated and EAL Employees Coalition Acquisition Corp., an Illinois corporation, Charles E. Bryan, and Robert V. Callahan, Plaintiffs,

v.

TEXAS AIR CORPORATION, Frank Lorenzo, TAC/EAL Acquisition, Inc., Eastern Air Lines, Inc., etc., et al., Defendants.

No. 86–2328–Civ.

United States District Court,
S.D. Florida,
Miami Division.

Feb. 29, 1988.

George H. Tucker, Manners, Tucker, Carrillo & Damoorgian, P.A., Miami, Fla., Beverly & Freeman, West Palm Beach, Fla. by Don Beverly, Kelly, Black, Black, Byrne & Beasley, P.A., Miami, Fla., for plaintiff Elizabeth A. Hastings–Murtagh.

Blackwell, Walker, Fascell & Hoehl, Miami, Fla., by John R. Hoehl, P.A., for defendants.

Charles T. Goolbee, Houston, Tex., for Texas Air Corp. & Frank Lorenzo.

Joseph B. Leonard & Philip Bakes Greenberg, Traurig, Askew, Hoffman, Lipoff, Rosen & Quentel, Miami, Fla., for Eastern Airlines, Inc.

### ORDER GRANTING IN PART AND DENYING IN PART THE MOTION FOR CLASS CERTIFICATION

JAMES LAWRENCE KING, Chief Judge.

This case of first impression involves a fundamental question concerning the de-

gree of representation to which an individual is entitled. In resolving the motion, the court must decide whether an individual's interest can be affected by the outcome of a case when that individual is neither given a chance to know of the action nor an opportunity to be represented therein.

The court holds today that no one's rights in this country can be affected by the outcome of a litigation unless that person is afforded minimal due process. Most of the time, this is guaranteed throught Fed.R.Civ.P. 19, which provides that all persons potentially affected by the outcome of a litigation be joined to the action or the action cannot be maintained. This opinion finds that the class action rule, Fed.R.Civ.P. 23, in essence guarantees the same thing. If all persons affected by the outcome of a litigation are not before the court as members of a class, the court cannot maintain the action as a class action. Obviously, minimum due process, being the providing of notice of an action and the opportunity to be heard, brings an affected individual before a court.

The plaintiff is an Eastern Airlines employee and owns stock in the company. She petitions the court for class certification of her claims. The plaintiff wants the court to certify this case as a class action and to permit her to represent all of Eastern's employee-shareholders in an effort to rescind the Eastern Airlines/Texas Air merger.

If successful, the consequences of this action obviously extend beyond the proposed class of employee-shareholders, for a recision of the merger would involve all stockholders of Eastern, whether employed by the company or not. The court therefore, must determine whether this action can be maintained as a class action even though the interests of unrepresented, nonclass members could be affected. After a hearing, the court certifies only those claims that can be properly maintained by this employee-shareholder representative.

## BACKGROUND

The seventy-page complaint in this case includes seven separate claims for relief.

Because the complaint focuses on both complex stock ownership plans and elaborate business transactions, the court examines the events that led to the Eastern/Texas merger before addressing the class certification issues.

### A. EASTERN EMPLOYEE STOCK OWNERSHIP

In the late 1970's Eastern Airlines' financial performance started to lag behind that of its competitors. These problems resulted from the country's general economic recession, the ill effects of the OPEC embargo, and the chaos that ensued after airline deregulation.

To respond to this economic and competitive pressure, Eastern sought concessions from its employees. The Eastern employees generally assented to the concessions. In return, the Eastern employees were given the right to acquire Eastern common stock and given representation on the Eastern Board of Directors. The record reflects that Eastern developed several stock ownership plans with its employees.

Eastern and its employees operated under the Variable Earnings Program from 1977 to 1982. In this time frame, Eastern employees assert they have contributed $150,000,000 to Eastern's operations through wage concessions. In exchange for these concessions, the employees were given a share of Eastern's profits, which amounted to approximately $10,000,000. In 1980, the Variable Earnings Program gave each employee ten shares of common stock in lieu of any cash distribution of profits.

In 1982, Eastern and its employees initiated the Investment Bonus System. This agreement provided for the employees to participate further in Eastern's profits through a percentage calculation.

In June 1983, Eastern employees agreed to make voluntary contributions to the Investment Bonus System and to defer some retroactive pay to which they claim they were entitled. In addition, the pilots' union agreed to accept convertible subordinated debentures in return for wage concessions.

The pilots also were allowed to appoint two members to Eastern's board.

In September 1983, the Wage Investment Program was established. Through this agreement, the employees agreed to an 18% wage deduction pursuant to which wages were to be used to purchase 12,000,-000 shares of Eastern common stock and an additional 3,000,000 shares of preferred stock, which was eventually to be converted into an additional 3,000,000 shares of common stock.

The workings of the Wage Investment Program have significant consequences in this present action. Through this program, the Eastern employees acquired the ownership of 25% of Eastern's common stock. This amount made the Eastern employees, taken as a whole, the largest shareholder of the company. Also through the program, Eastern's three major unions established trusts for their members. These trusts and, hence, their beneficial members, received "top-up" rights. These rights are similar to statutory preemptive rights, and give their holder the right to purchase additional shares of common stock in the event of future stock offerings.

Further developments in Eastern's relationship with its employees followed in the fall of 1983 when Eastern negotiated a new labor agreement with its flight attendants and machinists. Eastern gave both the flight attendants and machinists a right to appoint one board member each. In addition, Eastern's management gave the employees the right to review Eastern's financial records on a regular basis and promised that the employees would be consulted regarding a variety of management decisions before they were made.

In February 1985, the Eastern employees agreed to continue the Wage Investment Program, which officially terminated on December 31, 1984. The agreement this time was conditioned upon the termination of the program if certain production efficiencies were realized.

In early 1986, the Eastern unions embarked upon an extensive public campaign that sought to encourage their members and other nonunion employees to purchase Eastern common stock. The purpose for these acquisitions was to increase the influence of the employees in the management of the company. The three unions formed a coalition that in turn filed a Form 13D with the Securities and Exchange Commission that disclosed their intent to increase employee ownership of Eastern common stock.

This campaign ran parallel to the board's attempts to shop Eastern around. Eastern management began to look for a buyer for Eastern, hoping to avoid what appeared to management to be certain bankruptcy.

## B. THE TEXAS AIR/EASTERN AIRLINE MERGER

With a desire to explore all avenues available to keep Eastern afloat, the Eastern management decided to consider selling the airline, either in whole or in part. In November 1985, Eastern instructed Merrill Lynch Capital Markets ("Merrill Lynch"), its investment banker, to prepare a valuation study. Merrill Lynch was to evaluate all options regarding the sale of some or all of Eastern.

In December 1985, Frank Borman, president of Eastern, decided to personally pursue a buyer. On December 4, 1980, Borman met with Frank Lorenzo, the chairman of Texas Air. The two officials discussed the possibility of a friendly acquisition of Eastern by Texas Air. They met again on December 10, and Mr. Lorenzo indicated an interest in Eastern.

In the interim, Eastern's grave financial condition was worsened by bitter labor negotiations. Eastern requested the release from collective bargaining negotiations with its flight attendants' and pilots' unions. This led to both unions setting strike dates for early 1986. The machinists, at this point in time, had twenty months left on their contractual agreement.

The plaintiff claims that the proxy materials detail the remaining series of negotiations between Eastern and Texas Air. On February 14, 1986, Eastern's executive committee authorized Merrill Lynch to contact potential buyers.

The Eastern board held a meeting on February 21, 1986. Borman told the board that a "specific entity" had expressed an interest in acquiring Eastern. Pursuant to his understanding with Mr. Lorenzo that Texas Air's identity was not to be disclosed, Mr. Borman refused to identify the entity. The Eastern board passed a resolution that directed Borman to pursue discussions with the unnamed entity.

Shortly after this meeting, Mr. Borman contacted Mr. Lorenzo. Under circumstances resembling the plot of a John Le-Carre novel, Mr. Lorenzo offered to purchase Eastern. He agreed to keep the offer open for forty-eight hours, which meant that the offer would terminate at midnight on February 23, 1986. Mr. Borman agreed to present Mr. Lorenzo's offer to the board.

On February 22, 1986, Mr. Borman met with the three main Eastern unions. Mr. Borman informed them of the Lorenzo offer and its relatively short deadline.

On February 23, 1986, a meeting of the Eastern board was convened to consider Texas Air's merger proposal. Eastern's counsel explained the terms of the deal. The proposal provided that a wholly-owned Texas Air subsidiary would be merged with Eastern. Eastern shareholders would receive for each share of Eastern common stock $4.50 in cash, plus $1.75 that would be realized from the sale of certain Eastern securities and high-yield/high-risk bonds that are labeled in the Wall Street vernacular as "junk bonds."

At the meeting, Merrill Lynch briefed the board on the Texas Air offer, and commented on the results of its valuation study. The plaintiff claims Merrill Lynch valued Eastern as high as $10.81 per common share if Eastern were sold as a whole, and as high as $13.41 per share if Eastern assets were sold individually.

The meeting adjourned and resumed two-and-one-half hours later when the board considered a proposed draft merger agreement. The board reviewed the draft agreement with their investment bankers. The plaintiff claims the board was informed that Texas Air agreed to indemnify the Eastern directors up to $35 million in connection with the merger. Texas Air also extended the deadline until 4:00 a.m.

At approximately 2:30 a.m., the board reconvened and approved the merger. Later that day, Eastern and Texas Air executed an "Agreement and Plan of Merger."

The terms of the merger agreement are complex. Eastern agreed to sell to Texas Air 10,935,000 shares of common stock for a price of $6.25 per share. This price represented $3.13 per share in cash and $3.12 per share through a 14.125% promissory note due in 1991. Eastern also agreed to pay Texas Air a nonrefundable "inducement fee" of $20 million. In exchange, Texas Air agreed to purchase all of Eastern's outstanding shares. Eastern also gave Texas Air an irrevocable option to purchase ten million shares of Eastern common stock for $7.50 per share if another entity acquired more than 5% of Eastern's outstanding common stock. In corporation acquisition jargon, this provision is called a "lock-up" option, meaning, of course, that the deal is guaranteed of going through because the option, if exercised, makes the acquisition of the target company by another party prohibitively expensive. The lock-up option was later amended to allow Texas Air to purchase a controlling 51% of Eastern if the condition was triggered. The agreement also contained a provision that prevented Eastern and its board from encouraging or soliciting offers for the purchase of Eastern. Among the investment banking circles, this standard provision is known as a "no-shop" provision, for the board cannot solicit or review another offer to buy the company.

The plaintiffs contend that the unions desired to make an offer for Eastern during the Texas Air negotiations but the board rejected their efforts. On August 29, 1986, Charles Bryan did propose to buy Eastern for $10.25 per share. The board refused to discuss the offer pursuant to the terms of the "no-shop" provision.

The employees tried several other methods hoping to block the pending merger. They filed an action before this court seeking to enjoin the parties from consummat-

ing the merger. After the court denied their motion for declaratory relief, the employees amended their complaint and bring this class action.

## C. THE CLAIMS FOR RELIEF

Five counts are currently before the court for class certification. Because the particulars of these counts, as well as the proposed class for each claim are of importance here, the court details each claim.

Count I is a claim under § 14(a) of the Securities and Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78n(a) (1984), and Rule 14a–9, 17 C.F.R. § 240.14a–9 (1987), promulgated thereunder. The plaintiffs demand a recision of the Texas Air/Eastern merger or, in the alternative, compensatory damages. The proposed class for this claim is all employees, excluding defendants, of Eastern who beneficially owned Eastern's common stock on October 8, 1986, the record date for the stockholders who were entitled to receive the proxy materials.

Count II is a breach of fiduciary duty claim. The plaintiffs once again demand recission of the merger or, in the alternative, compensatory damages. The proposed class for this claim is all Eastern employees who owned Eastern common stock on February 24, 1986, the date of approval of the merger by Eastern's board.

Count III is a waste of corporate assets claim. The plaintiffs desire to enjoin the Eastern board from further wasting of assets or, in the alternative, seek compensatory damages. The proposed class here includes all employees of Eastern who beneficially owned Eastern common stock during the period commencing February 24, 1986, and ending on November 25, 1986.

Count IV is another § 14(a) claim, concerning Eastern's 20% participating non-cumulative convertible preferred stock. The plaintiffs demand recission or, in the alternative, compensatory damages. The proposed class for this claim is all Eastern employees who beneficially owned Eastern's 20% participating non-cumulative convertible preferred stock on October 8, 1986.

Count V is breach of fiduciary duty claim. The plaintiffs again seek recission or, in the alternative, compensatory damages. The proposed class here includes all Eastern employees who beneficially owned the 20% preferred stock on February 24, 1986.

The court will now determine which of these counts should be certified as a class action. In so deciding, the court will examine the law governing class certifications, determine the policies promoted through Fed.R.Civ.P. 23, and then review each claim in light of these findings.

## DISCUSSION

■ A fundamental aspect of constitutional law is the providing of minimal due process to an individual who could have an interest affected by the outcome of a litigation.[1] A court, therefore, must assure that these affected individuals are provided with notice of the action and an opportunity to be heard. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314–15, 70 S.Ct. 652, 657–58, 94 L.Ed. 865 (1950); *cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174–75, 94 S.Ct. 2140, 2150–51, 40 L.Ed.2d 732 (1974).

■ This principle requires that all individuals affected by the possible outcome of a litigation be before the court. Obviously, the sending of notice and the providing of

---

**1.** An individual's interest is usually affected by the outcome of an action only if a judgment is entitled to *res judicata* effect. *See United States v. International Bldg. Co.*, 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182 (1953). In order for a judgment to have this effect, an individual must have been afforded minimal due process. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 2975, 86 L.Ed.2d 628 (1985).

Certain situations exist, however, where an individual's interest could be affected by a case's outcome even if that person is not afforded due process. These instances arise when a plaintiff's desired remedy would obviously affect persons that are not joined in the action. For example, a plaintiff may demand recission of a contract to which he and two other parties subscribed. The plaintiff could join only one of the other parties. If a court grants the requested relief, the one party not joined is affected because that party's rights under the contract would be expunged.

an opportunity to be heard brings an individual before a court.[2] A party may be before a court either as a party to the action or as a class member in a class action.

■ For nonclass actions, Fed.R.Civ.P. 19 assures that all affected individuals are before a court. Fed.R.Civ.P. 19(a) establishes guidelines that assist a court in determining whether an individual's interest is truly affected. In essence, a court must decide whether a person's rights as a practical matter would be affected by the possible outcome of a case. *See Provident Tradesman's Bank & Trust Co. v. Patterson,* 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968); *Challenge Homes, Inc. v. Greater Naples Care Center,* 669 F.2d 667 (11th Cir.1982). The Rule then requires that this individual be joined as a party to the action if not one already, or the suit must be dismissed. Fed.R.Civ.P. 19(a), (b).

■ For class actions, an individual's interest may be affected even if that person is not a formal party to the action.[3] *See Hansberry v. Lee,* 311 U.S. 32, 40–41, 61 S.Ct. 115, 117–18, 85 L.Ed. 22 (1940). The reason for this result is that Fed.R.Civ.P. 23 brings these individuals before a court as a class, and, thus, guarantees that their

interests will not be affected without due process of law.[4]

■ Similar to Fed.R.Civ.P. 19, Fed.R. Civ.P. 23 assures that an individual affected by the possible outcome of a class action is either a member of the putative class or the litigation cannot proceed as a class action. As with all individuals that would be affected by the possible outcome of a litigation, these individuals must be afforded due process. The due process safeguards of Fed.R.Civ.P. 23 are applicable only to those parties before the court as members of a class. If an individual has an interest affected by the possible outcome of a class action, and is neither a party to the action or a member of a class, a court cannot let the class action proceed. The court must utilize its discretion and deny class certification.

■ This problematic situation is presented here. The plaintiffs' suggested outcome for this case would affect persons currently not before the court. In the majority of their claims, the plaintiffs demand recision of a merger consummated through the tendering of stock. The plaintiffs desire to maintain this suit as a class action, with the proposed class consisting of only a partial number of all stockholders. If the requested relief is granted, employee and

**2.** Of course, a defendant can only be properly before a court if the minimum contacts requirement of the due process clause is satisfied. *See International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

**3.** Fed.R.Civ.P. 23 governs the same issue in class action, for Fed.R.Civ.P. 19 excepts class actions from its scope. *See See* Fed.R.Civ.P. 19(d).

**4.** The mechanics of Fed.R.Civ.P. 23 assure that the class plaintiffs before a court are afforded minimal due process. If a class action is maintained under subsection (b)(3), minimum due process is guaranteed through the requirements of subsection (c)(2). The class would be entitled to notice, as well as to "opt-out" of the litigation and not be bound by the class judgment. Fed.R.Civ.P. 23(c)(2). If they decide to stay "in," a court still must determine whether they would be adequately represented under

Fed.R.Civ.P. 23(a)(4). *See Hansberry v. Lee,* 311 U.S. 32, 42–43, 61 S.Ct. 115, 118–19, 85 L.Ed. 22 (1940). If a class action is sustained under subsection (b)(1) or (b)(2), minimal due process is assured through other provisions. A court may exercise its discretion and order that notice plus an opt-out provision be sent to the class. *See Penson v. Terminal Transport Co.,* 634 F.2d 989 (5th Cir.1981). Otherwise, a court must specifically define the class in the final substantive judgment, Fed.R.Civ.P. 23(c)(3), as well as determine whether the interests of the absent class members were adequately represented, Fed.R.Civ.P. 23(a)(4). If an absent class member was not afforded due process, that party is not bound by the class judgment. *See Gonzales v. Cassidy,* 474 F.2d 67 (5th Cir.1973); *Laskey v. International Union,* 638 F.2d 954 (6th Cir.1981); *cf. Johnson v. General Motors Corp.,* 598 F.2d 432 (5th Cir.1979) (finding an absent subsection (b)(2) class member who was neither given notice nor an opportunity to be heard was not bound by class judgment for declaratory relief and, thus, could bring a claim for monetary damages).

nonemployee stockholders would in effect be bound, for the court's order of recission would require *all* stockholders who tendered their stock to return the consideration received in the exchange and become stockholders once again. Accordingly, the court will deny class certification for each of the plaintiff's claims where recission is demanded.[5]

### I. Insofar As The Proposed Class Demands Recision In Counts I, II, IV And V, Class Certification Is Denied.

The plaintiffs seek à recision of the Texas Air/Eastern merger in each of counts I, II, IV and V of their complaint. Counts I and IV are brought under § 14(a) of the 1934 Act. Counts II and V are breach of fiduciary duty claims exerted under Delaware law. The proposed class for counts I and II include all employee-common stockholders. The proposed class for counts IV and V includes all employee-preferred shareholders.

■ If the court grants the requested relief for any of these claims and, thus, rescinds the merger, the interests of nonemployee-stockholders, both common and preferred, would be affected. Many of these nonemployee-stockholders already tendered their shares pursuant to Texas Air's tender offer that brought about the merger. If recision is ordered, these individuals would be forced to return the consideration received in exchange for their shares, and once again resume their positions as Eastern Airlines stockholders. *See, e.g., Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1296 (N.D.Ill.1981). Other nonemployee shareholders who did not tender will also have their financial stakes in Eastern affected if recission is ordered. The putative class of all Eastern employee-stockholders, therefore, does not include all individuals who would have an interest affected by the litigation.

The plaintiffs contend that the class here need not include all the nonemployee-stockholders. They theorize that the employee-stockholders can impliedly represent the nonemployee-stockholders without conflict. They rationalize that the interests of both groups are coextensive, for the employee-stockholders desire, just as the nonemployee-stockholders do, a higher return on their investment. The plaintiffs believe rescinding the merger and, thus, allowing the opportunity for more valuable offers to be considered, could give a higher yield on all stockholders' investments in Eastern.

As an alternative argument, the plaintiffs maintain that if some nonemployee-stockholders disagree with the employee-stockholders' positions, the class can still be certified because these nonemployee-stockholders' interests are protected by the defendant. For this proposition, the plaintiffs rely upon *Stolz v. United Brotherhood of Carpenters & Joiners,* 620 F.Supp. 396 (D.Nev.1985). *Stolz* involved a labor union contest over the mechanics of a dues increase vote. *Id.* at 398–99. The proposed class representative, who had voted against the increase, sought to certify a class that consisted of all members who voted, irrespective of the content of their vote. *Id.* The defendant contested the certification on the grounds that the plaintiff's "vote-against" position was antagonistic to the union members who voted in favor of the increase. *Id.* at 405.

The *Stolz* court first found that no antagonism existed. The court noted that the vote on dues increase was presented to the unionfold hand-in-hand with a pay increase vote, apparently in violation of each members statutory rights. Given this realization, the court found no antagonism because those who voted in favor of the increase would still disapprove of the manner in which the vote was presented to them.

---

**5.** The court believes the resolution of this problem need not depend upon the holding in *Becker v. Schenley Industries, Inc.,* 557 F.2d 346 (2d Cir.1977). The *Becker* court refused to reverse a district court's denial of class certification because the class plaintiffs could have intervened in another pending action. *Id.* at 348. Concurrent with this action is a Delaware class action wherein many of the same claims are asserted. Because some question exists as to whether the claims unique to the employee-stockholders would be given full effect in the Delaware action, the court refuses to follow *Becker.*

The *Stolz* court next handled the question of whether the class representative could adequately represent those who had voted in favor of the increase even if they were fully appraised of their rights. The court found that even if these members disagreed with the position of the class representative, their interest would be protected by the defendants. *Id.* at 406. The court found that the defendants would assert energetically and forcefully the positions maintained by the dissenters. *Id.; see also Horton v. Goose Creek Independent School District,* 677 F.2d 471, 490 (5th Cir.1982) (relied upon in *Stolz*).

This court cannot agree with the plaintiffs. The court notes that in cases of minority stockholders challenging a consummated merger, conflicts among tendering and nontendering shareholders are commonplace. *See Schnorbach v. Fugua,* 70 F.R.D. 424, 433 (S.D.Ga.1975). These conflicts center around the requested remedies.

In *Guttmann v. Braemer,* 51 F.R.D. 537, (S.D.N.Y.1970), the plaintiff sought to represent a class of shareholders consisting both of those who tendered in favor of the merger, and those who had not. The plaintiff, who did not tender, primarily requested recission, and sought damages only as an alternative remedy. *Id.* at 538. The court found a conflict between the class representative and the tendering shareholders. The court believed those who had tendered would not desire to refund the consideration received in exchange for their shares. *Id.* at 539. These individuals, therefore, would not want a recission, but would not be adverse to receiving damages that would correct their loss that resulted from the alleged fraud in the transaction. *Id.* at 539. On the other hand, the nontendering shareholders would primarily desire recision. Based on this conflict, the *Guttmann* court denied class certification. *See also Issen v. GSC Enterprises, Inc.,* 508 F.Supp. 1278, 1296 (N.E.Ill.1981); *Green v. Santa Fe Industries,* 82 F.R.D. 688 (S.D.N.Y.1979); *Weisfield v. Spartans Industries, Inc.,* 58 F.R.D. 570, 581–82 (S.D.N.Y.1972); *Maynard, Merel & Co. v. Carcioppolo,* 51 F.R.D. 273 (S.D.N.Y.1970); *Pomierski v.*

*W.R. Grace & Co.,* 282 F.Supp. 385, 391–93 (N.D.Ill.1967).

Nonetheless, the court does not rely on *Guttmann* here. In *Stolz* and *Guttmann,* all the individuals who would be affected by the possible outcome of the pending litigation were members of the proposed class. This afforded both courts with an opportunity to determine if all affected parties would be afforded minimal due process, *i.e.,* whether they would have notice of the action and whether they would be adequately represented.

Without having before the court all the individuals who would be affected by the requested outcome of this litigation, the court cannot assure that the nonemployee-stockholders, who have an interest that would be affected by the requested outcome here, will be afforded minimal due process. The court has no precise manner in which to evaluate the interests of parties that are not before it. Accordingly, class certification of counts I, II, IV and V should be denied to the extent these counts seek the remedy of recission.

II. Insofar As The Proposed Class Demands Compensatory Damages In Counts I, II, IV and V, Class Certification Is Granted.

As an alternative remedy to recision in counts I, II, IV and V, the plaintiff seeks compensatory damages. Because the putative class here includes all those who have an interest affected by the suggested outcome of this case and because the plaintiff satisfies the requirements of Fed.R.Civ.P. 23, the court will certify the proposed class for each of these counts.

The putative class for each of these claims includes all individuals who have an interest affected by the suggested outcome of this case. The court reaches this conclusion by first considering the employee-common stockholders and then the employee-preferred stockholders.

■ The proposed class of employee-common stockholders for counts I and II could have been uniquely injured. Only these shareholders had contractal "top up"

rights. These rights may have given rise to a duty to disclose certain information in the proxy statement. This duty would obviously be owed only to the employee-stockholders and not to the stockholders at large. A breach of this duty could be construed both as a violation of § 14(a) and a breach of a fiduciary duty. When the class is viewed in this light, all the affected parties are properly included within the proposed class.

■ A similar conclusion is reached with respect to the proposed classes for counts IV and V. These employee-preferred stockholders could have been uniquely injured. These employee-shareholders received the preferred shares as part of the Wage Investment Program. This program was set up as part of a labor relations contract. Once again this contractual relationship may have given rise to a director's duty to disclose certain information in the proxy statement. This duty would not be owed to any other group of preferred stockholders. A breach of this duty may have given rise to a § 14(a) violation as well as a breach of fiduciary duty claim. When these classes are viewed in this light, all the affected parties are properly included within the proposed class.[6]

■ To these putative classes of employee stockholders, the court now applies the mechanics of Fed.R.Civ.P. 23. The court first examines the prerequisites of Fed.R.Civ.P. 23(a), and then determines which subsection (b) provision applies.

Fed.R.Civ.P. 23(a) lays out four prerequisites. These requirements are (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative

parties are typical of the claims or defenses of the class; (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

The numerosity requirement is easily satisfied here. The court first notes that a numerical yardstick is not the determinant for class certification; rather a court should examine the numbers involved to see if joinder of all is impossible or impracticable. *Westcott v. Califano*, 460 F.Supp. 737 (D.Mass.1978), *aff'd* 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1980). The three labor unions involved here, along with their many employees, would make joinder of all employees asserting individual claims impossible for an efficient adjudication of this controversy.

The questions of law and fact in this case are common to the class. The case concerns proposed duties owed to all employee-stockholders who make up the entire class.

The claims of the two proposed class representatives are typical of these putative classes. The employee-stockholders seek damages for a breach of fiduciary duty that may have been owed only to all employees. The purported breach of this duty flows to each employee-stockholder and, therefore, to each member of the class.

The class representatives here can adequately represent the class. They are Eastern employee-shareholders. They share the true interests of the class. Although conflicts appear not to exist now, if they develop later, they can be dealt with by subclasses and an "opt-out" provision. *See Feder v. Harrington*, 52 F.R.D. 178, 182 (S.D.N.Y.1970).

---

**6.** The court notes that even if all the Eastern stockholders were members of the classes here, the court most likely would have to create a subclass for them. These stockholders would share in the same claims as all the other stockholders, but because they arguably were owned special duties, a subclass would be needed to avoid any potential conflict. A conflict could arise because the employee-stockholders could recover under the claims unique to them while the nonemployee-stockholders could not recover at all.

This conflict would not be sufficient to deny class certification of these claims if the proposed class included all shareholders. The conflict is easily resolved by a subclass. Moreover, if the proposed class here included all Eastern shareholders, the court can see no reason now why class certification for all claims should not be granted. Of course, because this issue is not before the court, the court can not state that this belief would not be changed after the parties fully briefed the issues.

■ The court also finds that these classes are best certified under Fed.R.Civ. P. 23(b)(3). A class action here is the superior method for the fair and efficient adjudication of all controversies involved. The individual employee-stockholders prefer to have this action maintained as a class action. The controversies here are best managed as a class action, for this method allows all the employees and defendants to conduct all relevant discovery without repetition. Accordingly, pursuant to Fed.R.Civ. P. 23(c)(2), the court will direct the clerk of this court to issue notice to all members of these classes.

III. Because Count III Appers To Be A Derivative Claim, The Court Refuses To Certify Its Proposed Class Without The Parties Addressing The Requirements Of Fed.R.Civ.P. 23.1.

■ The court believes count III is a derivative claim under Delaware law. The defendants allege that the directors' gross negligence wasted the assets of Eastern. A claim like this is normally asserted by a shareholder derivatively on behalf of a corporation. Because the parties have not addressed whether this is a derivative claim and, therefore, have not argued the applicability of Fed.R.Civ.P. 23.1, the court will require the parties to brief these issues. The court, therefore, will defer its decision on whether the proposed class for this claim should be certified.

Accordingly, it is ORDERED AND ADJUDGED as follows:

(1) the motion for class certification for counts I, II, IV and V is DENIED to the extent these claims demand recission.

(2) the motion for class certification for counts I, II, IV and V is GRANTED only to the extent these claims demand compensatory damages.

(3) the clerk of this court is ORDERED to issue notice of this action that contains an opt-out provision pursuant to Fed.R. Civ.P. 23(c)(2) to the following classes:

(a) For count I, to all employees, excluding defendants, of Eastern who beneficially owned Eastern's common stock on October 8, 1986;

(b) For count II, to all employees, excluding defendants, of Eastern who beneficially owned Eastern stock on February 24, 1986;

(c) For count IV, to all employees, excluding defendants, of Eastern who beneficially owned Eastern's 20% participating non-cumulative convertible preferred stock on October 8, 1986;

(d) For count V, to all employees, excluding defendants, of Eastern who beneficially owned Eastern's 20% participating non-cumulative convertible preferred stock on February 24, 1986.

(4) the parties are ORDERED to brief the issues of whether the waste of corporate assets claim is a derivative claim, and, if so, whether the requirements of Fed.R. Civ.P. 23.1 are satisfied. The plaintiff is to file its response on or before March 21, 1988. The defendant is to file its response on or before April 11, 1988.