703 F.2d 301
 4 Employee Benefits Ca 1233
 LLC CORPORATION, Appellant,
v.
The PENSION BENEFIT GUARANTY CORP., a non-profit corporation
established within the United States Department of
Labor; Centerre Trust Company of St.
Louis, Appellees.
LLC CORPORATION, Appellee,
v.
The PENSION BENEFIT GUARANTY CORP., a non-profit corporation
established within the United States Department of
Labor, Appellant,
Centerre Trust Company of St. Louis.
 Nos. 82-1498, 82-1599.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 12, 1983.
Decided March 30, 1983.
 
 Henry Rose, Gen. Counsel, James N. Dulcan, Asst. Gen. Counsel, Lawrence F. Landgraff, Trial Atty., James L. Parris, Sp. Counsel, Washington, D.C., Attys. for appellant Pension Ben. Guar. Corp.
 Thomas C. Walsh, Bruce C. Oetter, St. Louis, Mo., for appellee St. Louis Union Trust Co.
 Charles E. Merrill, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for appellant.
 Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and FAGG, Circuit Judge.
 FAGG, Circuit Judge.
 
 
 1
 LLC Corporation, formerly known as Liberty Loan Corporation, appeals the district court's decision that under section 4044(d) of ERISA, 29 U.S.C. Sec. 1344(d), a portion of the excess assets of LLC's terminated pension plan should be distributed to the LLC employees participating in the pension plan. The district court's decision adopted the position of the Pension Benefit Guaranty Corporation (PBGC), the governmental corporation whose primary responsibility is supervising the termination of pension plans that have insufficient assets to pay plan liabilities. On cross-appeal, PBGC argues that the district court erred in not joining the plan participants as parties under Rule 19 of the Federal Rules of Civil Procedure. PBGC also contends that the court erred in determining the amount of interest owed the employees. Finding error, we reverse in part, 537 F.Supp. 355.
 
 
 2
 The pension plan in issue began in January of 1958 and was terminated by LLC in December of 1975 and replaced with a different plan. The terminated plan was a "defined benefit" plan because it established a schedule of retirement benefits for LLC's employees. Employee contributions of six percent of salary were mandatory. LLC's responsibility was to make the additional contributions necessary to fund the established retirement benefits. The amount contributed by LLC varied and was determined by outside actuaries.
 
 
 3
 Thereafter, in February of 1976, LLC filed a notice of intent to terminate with PBGC. It is undisputed that the plan's assets at termination were sufficient to satisfy all established benefits. Under ERISA, the plan's funds could not be distributed until PBGC issued a notice of sufficiency. PBGC refused to issue this notice until LLC's certificate of sufficiency contained language acceptable to PBGC regarding the distribution of any residual assets. PBGC's draft of the certificate of sufficiency required LLC to divide any residual assets between LLC and the employees according to a mathematical formula. LLC argued that it was entitled to all of the residual assets under the language of the plan and the language of section 4044(d).
 
 
 4
 In December of 1976, LLC, as plan administrator, signed a certificate of sufficiency which stated that any residual assets would be distributed "in accordance with the requirements of Sec. 4044(d)(2)" of ERISA and that "such distribution must be approved in advance by the [PBGC] or be made pursuant to a court order which is final and no longer subject to judicial review." PBGC then issued a notice of sufficiency which permitted distribution of the plan's assets.
 
 
 5
 After the distribution of benefits to employees and the payment of taxes and expenses, approximately $850,000 remained. PBGC used the relationship between total employee contributions and total contributions to produce a fraction which, when multiplied by the residue amount, yielded approximately $202,000 that PBGC determined should be returned to the plan employees. In June of 1977, LLC and Centerre Trust Company, formerly St. Louis Union Trust Company, entered into an escrow agreement in which $250,000 was deposited with Centerre. On January 6, 1978, PBGC approved the distribution of $600,000 of the residual assets to LLC, leaving only the $250,000 in the escrow agreement undistributed. On August 21, 1980, LLC sued PBGC and Centerre seeking a declaratory judgment that LLC is entitled to the assets held in escrow and seeking an injunction ordering payment of those assets to LLC. After a two-day bench trial, the district court, deferring to the interpretation of PBGC, ruled that the escrow assets should be distributed to the pension plan's participating employees and this appeal followed.
 
 
 6
 The issue before this court in LLC's appeal is whether ERISA entitles LLC or LLC's employees to approximately $202,000 of the $850,000 residue from LLC's terminated pension plan. Section 4044(d) of ERISA, 29 U.S.C. Sec. 1344(d), establishes a mandatory system for the allocation of single-employer, defined-benefit pension plan assets upon termination. It provides:
 
 
 7
 (d)(1) Any residual assets of a single-employer plan may be distributed to the employer if--
 
 
 8
 (A) all liabilities of the plan to participants and their beneficiaries have been satisfied,
 
 
 9
 (B) the distribution does not contravene any provision of law, and
 
 
 10
 (C) the plan provides for such a distribution in these circumstances.
 
 
 11
 (2) Notwithstanding the provisions of paragraph (1), if any assets of the plan attributable to employee contributions, remain after all liabilities of the plan to participants and their beneficiaries have been satisfied, such assets shall be equitably distributed to the employees who made such contributions (or their beneficiaries) in accordance with their rate of contributions.
 
 
 12
 The parties agree that the requirements of subsection (d)(1) have been fulfilled; the issue therefore narrows to subsection (d)(2) and whether any portion of the $850,000 residue is "attributable to employee contributions" so that such portion "shall be equitably distributed to the employees."
 
 
 13
 PBGC witnesses testified that a portion of the excess assets should be considered "attributable" to LLC's employees. Carl Harbachewski, a PBGC case officer in plan terminations, and Renae Hubbard, a PBGC attorney, testified that PBGC's policy concerning joint contribution plans is that a portion of the excess assets should be allocated to the employees. PBGC's interpretation of the statute is based on the commingling of the contributions of the employees and LLC to form a single trust fund. PBGC contends that these commingled contributions are invested and the scheduled plan benefits paid without distinction as to the original source. Since the contributions and earnings are not distinguishable once the funds are commingled, the portion of contributions and earnings paid out as benefits or left as residual assets cannot be identified as originating from LLC or from the employees. Therefore, both contributions created the asset pool that paid the benefits and that generated the surplus and the employees should receive a share of the surplus since it is "attributable" to their contributions.
 
 
 14
 PBGC has adopted various mathematical formulas to calculate the employees' statutory share. In this case, PBGC compared employee contributions of $1,320,279 to total contributions of $5,544,540 to determine that the employees' portion of the contributions equaled 23.8 percent. Next, PBGC multiplied that percentage times the residual amount, approximately $850,000, to determine the employees' portion of the residual assets: approximately $202,000.
 
 
 15
 PBGC agrees that the employer can make a factual showing that no residual assets are attributable to employee contributions. However, PBGC will not accept LLC's factual showing because LLC did not trace the different sources of money throughout the life of the pension plan in an on-going analysis. According to PBGC, an acceptable analysis must show that the employees' and LLC's contributions were not commingled but were instead separately invested in different investments whose earnings can be separately traced throughout the plan. PBGC argues that when contributions are commingled into a single trust fund, as in LLC's fund, then this tracing analysis cannot be utilized and PBGC's mathematical, proportional-share formula is appropriate.
 
 
 16
 LLC argues that it has proven that none of the residual assets in its terminated plan are "attributable" to the employees' contributions. Robert Graham, a certified public accountant, gathered historical data from the books and records of LLC to follow the assets in the pension plan from inception to termination. He testified that on a yearly basis, he determined the net contributions to the plan of both the employees and LLC. The employees' net contribution equaled the employees' mandatory six percent contribution minus any withdrawals paid to withdrawing employees. LLC's net contribution equaled the amount it was actuarily required to and did contribute minus the two percent interest paid to any withdrawing employees and minus any pension benefits paid. Therefore, retirement benefits paid to retiring employees through the years were charged against the contributions of LLC. Graham testified that this method was the most favorable approach to the employees possible since it maximized the employees' pool of assets at the expense of the employer's pool of assets. Graham's total of all the years of the plan yielded a total employee contribution of $1,312,938.
 
 
 17
 Graham also analyzed the pension plan to determine the portion of the plan's yearly earnings attributable to the employees. He calculated a ratio by dividing the total employee assets for the year by the total assets for the year. Multiplying that ratio times the total earnings for the year yielded the amount of the year's earnings attributable to the employee assets. Graham's total of all the years of the plan yielded total, employee-generated earnings of $518,302.
 
 
 18
 Graham testified that at the time of termination, the plan assets derived from employee contributions equaled $1,831,240 ($1,312,938 total employee contributions plus $518,302 total employee earnings). The employees received $4,381,965 in benefits when the plan terminated; therefore, Graham testified that the employee plan assets of $1,831,240 were expended in the process of funding termination benefits. Interestingly, the same result is reached if the total earnings of the plan from all investments ($1,707,813) are combined with the total employee contributions ($1,312,938) because the approximately $4,300,000 paid out in benefits upon termination exceeds $3,020,751. Graham also concluded that the residual assets represented over-contributions to the plan by LLC and were not attributable to employee contributions.
 
 
 19
 PBGC did not offer any evidence to rebut Graham's analysis that the residual assets resulted from excess contributions by LLC and did not include any assets attributable to employee contributions. PBGC's contention that the employees' money was not exhausted in paying termination benefits and formed part of the residue ignores the differing duties of the employees and LLC in funding the plan and is not entitled to deference by the courts. See Hodgson v. Board of County Commissioners, 614 F.2d 601, 615 (8th Cir.1980). The employees were responsible for the primary pay-in of a fixed percentage and LLC was responsible for contributing the amount above the employee contribution necessary to fund the plan benefits. LLC carried the risk in the plan because the benefits were established. If the plan's investments went sour the company would have to contribute more to fund the benefits than if the investments produced solid earnings. The plan, by making LLC's responsibility variable with the amount necessary to fund the benefits, established that the employees' fixed contributions and earnings should first fund the termination benefits.
 
 
 20
 PBGC, without rebutting LLC's factual analysis or making its own factual analysis, rejects LLC's analysis and argues that because the funds are commingled the participants must share in the residue. However, LLC has adequately demonstrated that no portion of the residue in its terminated plan is "attributable" to employee contributions and earnings. PBGC's rejection of a specific analysis of LLC's plan in favor of its generalized theory applicable to all joint contribution plans is completely unwarranted when it has not attacked or rebutted LLC's analysis.
 
 
 21
 LLC established that the employees' assets were exhausted in paying the termination benefits; therefore, none of the residue is "attributable" to the employees under ERISA and LLC is entitled to the entire residue.
 
 
 22
 In its cross-appeal, PBGC argues that the employees who participated in the plan should have been joined as parties pursuant to Rule 19(a) of the Federal Rules of Civil Procedure. However, Rule 19(a)(1) requires joinder only when the absence of the unjoined party prevents complete relief among the current parties: LLC, PBGC and Centerre. The focus is on relief between the parties and not on the speculative possibility of further litigation between a party and an absent person. Morgan Guaranty Trust Co. v. Martin, 466 F.2d 593, 598-99 (7th Cir.1972). The resolution of the issue of LLC's right to the possession of the escrow fund without government interference will result in complete relief between the present parties.
 
 
 23
 Further, the provisions of Rule 19(a)(2) do not require the joinder of the plan participants. The resolution of this case will not impair the employees' ability to sue LLC if they believe they are entitled to more money. See New England Patriots Football Club, Inc. v. University of Colorado, 592 F.2d 1196, 1201 (1st Cir.1979). The likelihood of such suits is remote; during the protracted period of this litigation no employee has attempted to become a party. The resolution likewise does not subject PBGC to a substantial risk of inconsistent obligations because PBGC is under no duty to litigate ERISA provisions for the benefit of plan participants. See 29 U.S.C. Sec. 1303(f). Centerre is a disinterested stakeholder who will be releasing the funds as directed in a valid court order and who therefore has no substantial risk of inconsistent obligations. LLC is willing to bear the remote risk of additional lawsuits by employees. The above discussion reveals that the district court did not err in refusing to join the plan participants pursuant to Rule 19.
 
 
 24
 In light of our earlier ruling that LLC is entitled to the escrow funds without interference by PBGC, it is unnecessary to address PBGC's second issue on cross-appeal concerning the appropriate interest earned by the employees on the escrow funds.
 
 
 25
 We reverse the judgment of the district court in part and remand for the entry of an order consistent with this opinion.