Carol **CHESEMORE**, Daniel Donkle, Thomas Gieck, Martin Robbins and Nannette Stoflet, on behalf of themselves, Individually, and on behalf of all others similarly situated, Plaintiffs,

v.

**ALLIANCE HOLDINGS, INC.**, A.H.I., Inc., David B. Fenkell, Pamela Klute, James Mastrangelo, Stephen W. Pagelow, Jeffrey A. Seefeldt, Alpha Investment Consulting Group, LLC and John Michael Maier, Defendants,

and

Trachte Building Systems, Inc. Employee Stock Ownership Plan and Alliance Holdings, Inc. Employee Stock Ownership Plan and Trust, Nominal Defendants.

**No. 09–cv–413–wmc.**

United States District Court,
W.D. Wisconsin.

Sept. 22, 2011.

---

R. Joseph Barton, Bruce F. Rinaldi, Karen Handorf, Robyn Swanson and Monya Bunch, Cohen Milstein Sellers & Toll PLLC, Washington D.C. and Andrew W. Erlandson, Hurley Burish & Stanton, Madison, WI, for Plaintiffs.

Jeffrey Wedel and Ryan Sobel, Squire Sanders & Dempsey, Cleveland, OH, for the Alliance Defendants.

Charles Wolf and Patrick Spangler, Vedder Price, Chicago, IL, for the Trachte Trustee Defendants.

James Convery, Laner, Muchin, Dombrow, Becker, Levin and Tominberg, Ltd., Chicago, IL, for the Alpha Defendants.

Alan Silver and Jonathan Norrie, Bassford Remele, Minneapolis, MN, for Defendant, Stephen Pagelow.

## OPINION and ORDER

WILLIAM M. CONLEY, District Judge.

Plaintiffs Carol Chesemore, Daniel Donkle, Thomas Gieck, Martin Robbins and Nannette Stoflet bring this putative class action, alleging that defendants' participation in the acquisition and eventual resale of Trachte Building Systems, Inc. ("Trachte") violated their rights under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461. As explained in detail in the court's order on motions to dismiss (dkt. # 172), plaintiffs were long-term employees of Trachte and members of the original Trachte Building Systems, Inc. Employee Stock Ownership Plan and Trust ("TBS ESOP" or "the Plan"). After Trachte's acquisition by Alliance Holdings, Inc. ("Alliance") in 2002, plaintiffs became members of its Employee Stock Ownership Plan and Trust ("AH ESOP"). The challenged transaction at issue here occurred in 2007 ("2007 Transaction"). Alliance resold the Trachte stock back to Trachte, which set up a TBS or Trachte ESOP. At that time, plaintiffs and other Trachte employees who were members of the AH ESOP received comparable accounts in the new Trachte ESOP that were immediate-

ly redeemed with Trachte stock, which quickly lost most, if not all, of its value. According to plaintiffs, the resale was a bad deal for Trachte employees from its inception, because now the new Trachte ESOP accounts were less valuable than the AH ESOP accounts upon transfer and the Trachte ESOP accounts became essentially and inevitably worthless as a result of the resale.

Now before the court is plaintiffs' motion for class certification. Having considered the parties' submissions, the court concludes that plaintiffs have made a sufficient showing that they satisfy the requirements of Rule 23(a) and that the class is maintainable under Rule 23(b)(1) or (2). Accordingly, a Rule 23(b) class will be certified.

## OPINION

Before a court certifies a proposed class, a plaintiff must show they satisfy the prerequisites set forth in Fed.R.Civ.P. 23(a):

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). In addition, plaintiff must show that the case falls into one or more of the categories for class actions listed in Rule 23(b). Aside from these requirements, the court should also determine whether the proposed class representatives have standing and whether the proposed class is "precise, objective and presently ascertainable." *In re Copper Antitrust Litigation*, 196 F.R.D. 348, 353 (W.D.Wis.2000); *see also Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir.1977) (holding that "there is a 'definiteness' requirement implied in Rule 23(a)").

## A. Standing

■ The first question to ask is whether plaintiffs have standing as members of the class they propose to represent. The proposed class is:

> Participants in the Trachte ESOP at any time from August 29, 2007 to the present

who had an account or received an allocation which they did not subsequently forfeit under the terms of the Plan and the beneficiaries of such participants.

Plaintiffs also propose a subclass:

> All persons who were participants or beneficiaries of the Alliance ESOP at the time of the 2007 Transaction and whose accounts were transferred to the Trachte ESOP on or about August 29, 2007 as part of the 2007 Transaction.

(They exclude from the class and the subclass any fiduciary of the Trachte ESOP or Alliance ESOP at the time of the 2007 Transaction and any members of their immediate families, legal representatives, heirs, successors or assigns.) Defendants concede that plaintiffs were all participants in the Alliance ESOP and had their accounts transferred to the Trachte ESOP pursuant to the 2007 Transaction. Nor is there reason to think they forfeited their rights under the Trachte ESOP. Therefore, plaintiffs are members of their proposed class and subclass. Thus, they have standing.

## B. Proper Definition

The next question is whether the class definition is sufficiently "precise, objective and presently ascertainable." *In re Copper Antitrust Litigation*, 196 F.R.D. at 353. The exact scope of both the proposed class and the subclass can be ascertained objectively by considering who has participated in the Trachte ESOP since August 29, 2007 and which of those had been beneficiaries of the Alliance ESOP before the transaction. Defendant Pagelow contends that the definition of the purported class is inadequate because it includes persons who were participants after the closing of the 2007 transaction. While true, Pagelow does not explain how this point relates to whether the scope of the class is ascertainable or whether the class definition is precise or objective, as opposed to whether inclusion of those class members is appropriate, creates a conflict or makes plaintiffs' claims atypical. The latter issues are discussed below.

■ Defendants also contend that it would be inappropriate to exclude from the class

definition those defendants who are themselves fiduciaries of either plan, at least until found to have breached a fiduciary duty. Defendants make an interesting, academic argument but fail to explain the necessity for including them in the class, much less how this objection undermines the definition of the class; nor do defendants support its position with any case law. Moreover, including these defendants as part of the class would appear to create problems, such as the obvious conflict between these defendants and the rest of the class and their separate counsel. It is proper to exclude defendants from the class. *See Neil v. Zell*, 275 F.R.D. 256, 270 (N.D.Ill.2011) (excluding defendants from class consisting of ESOP members). Accordingly, the definiteness requirement has been met.

## C. Rule 23(a) Factors

### (1) Numerosity

■ The first prerequisite listed in Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Defendants do not dispute that plaintiffs satisfy the requirements of Rule 23(a)(1) or (2) or Rule 23(b), but the absence of a dispute between the parties does not free the district court from performing its own analysis on these questions. The court has an independent duty to consider whether the requirements of Rule 23 has been met. *Davis v. Hutchins*, 321 F.3d 641, 648 (7th Cir.2003) ("Allowing certification by default or because the defendant has admitted that the class exists, with no independent analysis or determination by the district judge," would undermine the purpose of Rule 23 of "protecting absent class members whose rights may be affected by the class certification.").

■ In this case, the subclass alone may contain as many as 288 members, and the class is expected to contain more. Attempting to join all 288 members of the subclass would be impracticable. *See Musch v. Domtar*, 252 F.R.D. 456, 460 (W.D.Wis.2008) (numerosity requirement satisfied when potential class "could easily reach over a hundred members").

### (2) Commonality

■ Under Rule 23(a)(2), there must be "questions of law or fact common to the class" for a class to be certifiable. This case involves many common questions of law and fact for all class members arising out of the legality of assorted aspects of the 2007 Transaction, including fundamental questions about the facts and legality surrounding the transfer of the accounts from the AH ESOP to the Trachte ESOP, possible breaches of fiduciary duties owed both ESOPs and their members, and the immediate and longer term financial impacts of the transaction. *See Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir.1998) ("A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2).") (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992)).

### (3) and (4) Adequacy and Typicality

■ The last two prerequisites found in Rule 23(a)(3) and (4) are interrelated: the "claims and defenses of the representative parties" must be "typical of the claims or defenses of the class" and "the representative parties" must "fairly and adequately protect the interests of the class." For the following reasons, defendants contend that the named plaintiffs' claims, as well as the defenses asserted against them, are not typical of many other proposed class member in the following respects: (a) none of the named plaintiffs are current employees of Trachte; (b) the named plaintiffs are entitled to "floor price protection" for their accounts; (c) the named plaintiffs were AH ESOP and Trachte ESOP participants on the date of the 2007 Transaction; (d) the defense of laches may be asserted against plaintiffs; (e) some proposed class members have signed releases; and (f) the named plaintiffs and their counsel improperly obtained confidential information from Trachte to further their case. Defendants repeat these same or similar arguments in maintaining that the named plaintiffs and their counsel are not adequate representatives of the class.[1] The court disagrees.

---

1. Defendants' contention that plaintiffs' counsel's

involvement in obtaining confidential informa-

### a. Employment status of named plaintiffs

Because most of the named plaintiffs are *former* employees of Trachte, defendants contend that they do not share the same concern about the ongoing welfare of Trachte than do putative class members who are current employees.[2] Specifically defendants maintain that plaintiffs will be more willing to pursue remedies that could negatively impact Trachte, including ending employee ownership of Trachte. The facts are substantially less clear cut. As plaintiffs point out, they have a continued interest in the viability of Trachte, because they continue to own part of Trachte through their ESOP holdings. As for the loss of employee ownership of Trachte, plaintiffs claim only to be seeking rescission of the sale of the Trachte stock from Alliance and Pagelow to Trachte. This would return what plaintiffs claim is now-worthless Trachte stock held by the Trachte ESOP to Alliance and Pagelow in exchange for money and (allegedly) more valuable Alliance stock. Arranging such a transfer in Trachte stock would no doubt benefit some class members more than others, but it is by no means obvious that it would impact Trachte as a going concern. In fact, nothing in this record suggests plaintiffs are seeking to dissolve Trachte or block future employee stock ownership by the Trachte ESOP. Indeed, nothing would prevent the Trachte ESOP from repurchasing Trachte stock at fair value.

Conversely, defendants contend that the interests of former employees are in conflict with current employees because the Plan's method for allocating shares favors the latter. According to defendants, the Plan would require that a court-ordered payment into the Plan would result in shares allocated "in proportion to compensation to the year in which the payment is received," which would benefit current employees more than former employees. Defendants' argument appears drawn from statements by the Trachte ESOP's plan drafter, who opined that allocation would be in proportion to compensation for the year in which the payment is received. But the drafter also stated that he was "not sure" how the Plan would allocate money if the court were to award damages, because that sort of infusion was not "anticipate[d]" in the Plan. (Dkt. # 212–4, at 171.)

More importantly, the concern about allocation is only a *potential* conflict. Exactly how funds must be allocated is a question that will arise only if liability is established. As the Seventh Circuit has explained, such hypothetical conflicts at the damage phase are not grounds for refusing to certify a class at the liability stage; "[i]f and when they become real, the district court can certify subclasses with separate representation of each." *Kohen v. Pacific Inv. Management Co. LLC*, 571 F.3d 672, 680 (7th Cir.2009) (holding that denying class certification because of possible conflict about differences in class members' losses would be premature).

### b. Floor price protection

Next, defendants contend that plaintiffs' claims are atypical or a conflict exists because unlike some other class members, plaintiffs receive the benefit of a "floor price provision" under the Trachte ESOP, something only available to persons who were long-term employees and participants at the time of the 2007 Transaction. Specifically, certain pre-merger accounts are "guaranteed" under § 5.18 of the Trachte ESOP, so that the fair market value of the stocks of these accounts has a "floor" of 80% of the "balance of the Participant's Pre-merger Guaranteed Account." As a consequence, the named plaintiffs, as longer-term account holders, are entitled to 80 percent of the fair market value of their account as of the date of the transaction.

Plaintiffs point out, however, that this difference is more theoretical than real, since the stock is guaranteed by Trachte, which is

---

tion undermines the adequacy requirement in Rule 23(a)(4) is the same argument they make for denying appointment of class counsel pursuant to Rule 23(g)(4), and stand or fall together. Additional discussion related to appointment of counsel is found in a separate section below.

**2.** Although defendants treated all named plaintiffs as former employees, the record shows that, Nannette Stoflet returned to active employment from a temporary layoff after the parties had fully briefed the motion for class certification. (Dkt. # 263.)

bankrupt and subject to the agreement by the same bank under which Trachte has been operating under a forbearance agreement. Moreover, even if these obstacles were removed, the protection applies only in the event of retirement, death or disability.

Alternatively, defendants assert that "if the class representatives can settle this case for an amount sufficient to provide for their guaranteed price, they would have an incentive to do so, notwithstanding the interest of other class members." (Def. Pagelow's Opp. Br., dkt. # 211, at 10.) Defendants do not identify the amount or range of amounts at which guaranteed price provisions would kick in for some class members, while others would receive less. Perhaps such an amount or range exists, but there is certainly nothing in the record to infer that there is a substantial, present conflict between plaintiffs and some other members of the class. Should the conflict between plaintiffs and other members becomes more concrete as the case develops, the matter can again be addressed by creating subclasses for those members who do not enjoy floor price provisions and assigning one or more representatives for that subclass. *Kohen,* 571 F.3d at 680.[3]

### c. Inclusion of persons who became participants after the transaction

Defendants also argue that the named plaintiffs were all participants of the AH ESOP and became participants of the Trachte ESOP at the time of the 2007 Transaction, while other proposed class members only became Trachte ESOP participants after the closing of the transaction and were never AH ESOP participants.[4]

Defendant Pagelow does not explain why these later participants in the Trachte ESOP would necessarily be "in conflict" with those persons who became participants in the Trachte ESOP at the time of the 2007 Trans-

action. Defendant Alliance explains that the former class members would obviously not have accounts to unwind if the court ordered a rescission of the 2007 spin-off. As plaintiffs point out, however, only the subclass seeks to have AH ESOP accounts created for them as part of the rescission. This does not mean class members who never had an AH ESOP account have nothing to gain from the remedies pursued by the class, just not the remedy of rescission. The Trachte ESOP was "leveraged" by the debt it obtained to buy its stock. As part of that arrangement, the shares purchased by the loan were placed in a "suspense account" and are released on a level basis throughout the course of the loan at the price paid in the original transaction. Thus, even those who became participants in the Trachte ESOP after the 2007 Transaction participate in the repayment of the allegedly inflated purchase price from the original transaction. Nothing about this arrangement suggests that plaintiffs would have interests conflicting with those of the class or have claims atypical of the class or, at least, that they could not be addressed by appropriate subclasses.

### d. Laches, estoppel and unclean hands

Defendants also assert the affirmative defenses of laches, estoppel and unclean hands because plaintiffs waited nearly two years after the challenged transaction to bring their lawsuit, despite the fact that most if not all plaintiffs knew about the transaction and were aware that some employees had concerns about it. According to defendants, these affirmative defenses undermine the typicality and adequacy requirements because they "presen[t] a significant and predominant question" on liability and do not apply to other class members, particularly those who were not aware of the transaction before it occurred or at least those who did

---

3. The one subclass currently proposed apparently already encompasses all members with floor provisions. There may be a need to split that subclass as well in light of the fact that some members may have two separate floor provisions.

4. For some reason, defendant Pagelow frames this argument in terms of whether the class is properly defined, but the inclusion of these

members makes the scope of the class no less ascertainable or objective. Indeed, the problem Pagelow identifies with the inclusion of later participants is that they would "have no interest" and would be "in conflict" with earlier participants, which are concerns about adequacy, not class definition. (Pagelow Opp. Br., dkt. # 211, at 12.)

not communicate with counsel before the transaction occurred. (Alliance. Opp. Br., dkt. # 216, at 9.)

 "Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it may have against certain class members." *Wagner v. NutraSweet Co.,* 95 F.3d 527, 534 (7th Cir.1996) (citations omitted). The presence of potential affirmative defenses such as laches, estoppel or unclean hands are rarely an obstacle to typicality. *Id.* If there is one instance in which a particularized defense may undermine typicality, it is when "a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass." *Koos v. First Nat'l Bank of Peoria,* 496 F.2d 1162, 1164 (7th Cir.1974).

Defendants' primary position with respect to these affirmative defenses seems to be that plaintiffs were made aware of concerns about the transaction before it happened, but failed to file suit to stop it. This theory would apply to most, if not all, of the subclass because less than two months before the transaction occurred, the trustees of the Trachte ESOP disclosed the plans to transfer account balances from the AH ESOP to the Trachte ESOP at a town hall meeting employees were asked to attend. Among the facts that defendants assert were disclosed at that meeting were (1) Trachte would become highly leveraged and (2) employees' accounts would suffer a significant decrease in value. Assuming for the moment an obligation to sue existed under these circumstances, it is hard to imagine that these affirmative defenses will become a "major focus of the litigation."

As for adequacy, it is possible that a defense of laches might be found to apply to most or all subclass members, including plaintiffs, but not to the other class members, who all became participants after the transaction. But the mere fact that plaintiffs and other members of the subclass may have to address defenses unique to the subclass is hardly grounds for finding plaintiffs are inadequate representatives of the larger class, especially in light of the fact that nothing

suggests these affirmative defenses will swallow the case.

### e. Signed releases

According to defendants, a handful of class members (29 of 288) have signed releases that defendants contend preclude their right to participate in this class action. The parties disagree whether a recent decision in *Howell v. Motorola, Inc.,* 633 F.3d 552, 560–62 (7th Cir.2011), requires that the claims of these members be barred. At this point, however, it is not necessary to decide whether the releases at issue in this case require a different conclusion. Whether any class member's claim is barred by such a release is once again a particularized defense that will not be a major focus of this lawsuit. Indeed, it is unlikely that this minor issue will even require any individualized attention. Defendants do not suggest that any of the releases signed had substantially different language. Accordingly, whether the release precludes participation in this lawsuit will almost certainly come down to a matter of contract interpretation for a small group of class members who signed releases. There is no reason to believe that this will be anything more than a side issue, undermining any assertion that this defense makes plaintiffs' claims atypical or shows plaintiffs to be inadequate representatives of the class and subclass.

### f. Obtaining confidential information

Defendants have presented evidence suggesting that before plaintiffs filed this lawsuit, they and their counsel obtained documents from the company that were deemed confidential. In particular, shortly after the town hall meeting at which Trachte revealed its plan to buy its stock from Alliance, plaintiff Nannette Stoflet apparently contacted plaintiffs' current counsel and later met with other employees to discuss obtaining documents. Stoflet told the others (1) to send documents to plaintiffs' counsel or (2) to leave documents with her "anonymously" and she would send them to counsel.

Among the people Stoflet asked to obtain documents was Jill McDowell, Director of Information Technology at Trachte at the

time. McDowell anonymously gave Stoflet a draft fairness opinion and a valuation letter. The draft opinion was marked "CONFI-DENTIAL" and the letter was addressed to defendant Mastrangelo. Using her role in the IT Department, McDowell obtained and anonymously gave Stoflet three more documents, including confidential closing documents related to a loan Trachte received to make the stock purchase. Stoflet provided those documents to counsel.

In addition to the draft fairness opinion, the valuation letter and the confidential closing documents, plaintiffs also acknowledge obtaining a document regarding seller financing entitled "Certificate of Chief Financial Officer"; unaudited monthly financials and management reports; a document entitled "CONFIDENTIAL Management Presentation December 2006"; and an email apparently printed from defendant Jeffrey Seefeldt's email account, written by Brian Anderson and addressed to defendant Pam Klute with copies to defendants Jeffrey Seefeldt and James Mastrangelo. (It is not clear how plaintiffs received these documents, but they produced them during discovery.) None of plaintiffs (1) returned any of these documents to Trachte before producing them during discovery, (2) asked whether they were properly obtained, or (3) obtained permission from defendants Seefeldt or Mastrangelo to disclose the documents.

Defendants contend that neither plaintiffs nor their counsel are adequate representatives because the manner in which they obtained these documents "raises serious ethical concerns." (Trustees' Opp. Br., dkt. # 214, at 8.) In particular, defendants emphasize that Stoflet encouraged other employees, including the IT Director, to give her information anonymously, which she passed on to her counsel. Defendants also believe that plaintiffs' counsel must have known how the documents were being obtained and may have even arranged it, but at the very least they received documents marked "confidential" without attempting to notify Trachte or return them.

Defendants' theory is that these facts are sufficient to find plaintiffs lack both the "integrity and credibility" necessary to be rep-resentatives of the class, but the only cases they cite in which the "integrity and credibility" language was used against named plaintiffs involve false testimony or false statements by putative class representative's. *Searcy v. eFunds Corp.*, No. 08 C 985, 2010 WL 1337684, *5 (N.D.Ill. Mar. 31, 2010) (false statements in declaration); *Pope v. Harvard Banchares, Inc.*, 240 F.R.D. 383, 390 (N.D.Ill.2006) (person with "significant influence" on named plaintiff's decisionmaking had been convicted of filing false federal income tax returns); *Davidson v. Citizens Gas & Coke Utility*, 238 F.R.D. 225, 229–30 (S.D.Ind.2006) (previous felony convictions and lying about convictions); *Kaplan v. Pomerantz*, 132 F.R.D. 504, 508–10 (N.D.Ill. 1990) (false testimony at deposition).

Defendants do not identify *any* false statements by plaintiffs. Instead, defendants focus on what they describe as plaintiffs' role in "improper[ly] gathering" documents. Assuming improper document gathering could be a reason to find a plaintiff lacking in integrity or credibility, and thus an inadequate representative, defendants fail to submit evidence that supports any finding that plaintiffs acted improperly here. First, defendants have no evidence that any plaintiff other than Stoflet was involved at all in obtaining the subject documents. Defendants argue instead that all plaintiffs are somehow "tainted" because some or all of them (they do not specify which) objected on the basis of privilege to numerous attempts to obtain information about how the documents in question were gathered.

Second, even if these plaintiffs could be found to be involved in Stoflet's document-gathering, this evidence at most would show that plaintiffs sought and obtained documents from other employees anonymously. While defendants make much of the fact that some of the documents obtained appear to be confidential, they offer no evidence that any plaintiff was aware that the documents being obtained were confidential, or even that they hoped or believed that employees would provide confidential documents, much less that they had no right to share them on a confidential basis with their counsel in order to better understand their rights. Although the

anonymous nature of plaintiffs' alleged "scheme" could have encouraged employees to produce confidential documents, violating confidentiality with impunity is not the only reason to invite employees to provide documents anonymously: anonymous submissions allow current employees to produce information without fear of retaliation from their employer. Defendants' evidence of wrongdoing by plaintiffs is not strong enough here to support a finding that plaintiffs lack sufficient credibility or integrity to act as class representatives.

With respect to the adequacy of plaintiffs' counsel, defendants argue more persuasively that at least counsel should have been concerned that plaintiffs were providing "anonymous source" documents, which defendants describe as a "red flag." Certainly, plaintiffs' counsel should have suspected the documents were coming from anonymous sources in light of their content, which included documents directed to upper management at Trachte and financial documents of a sort not normally distributed to most employees.

Defendants suggest that by receiving these documents without notifying Trachte, plaintiffs' counsel violated Wisconsin's Code of Conduct for Attorneys, which provides that "[a] lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender." WI SCR 20:4.4(b). This provision typically applies to the inadvertent production of privileged or confidential, non-responsive documents during litigation itself. Defendants do not explain how any of the documents in question could be said to have been "inadvertently sent" or, more important, how any of the documents "relat[e] to the representation of the lawyer's client." Certainly, none of the documents appear to be privileged or work product, and all of the documents are alleged to have been sent to counsel intentionally, albeit without authorization of the documents' owner. Defendants point to the comments to ABA's Model Rule 4.4(b), but comment 2 explains that the rule "does not address the legal duties of a lawyer who receives a document that the lawyer knows or reasonably should know may have been wrongfully obtained by the sending person."

Nonetheless, as defendants point out, Rule 4.4(b) may not be the only basis for sanctioning a lawyer's inappropriate receipt of documents. In *Burt Hill, Inc. v. Hassan*, No. Civ.A. 09–1285, 2010 WL 419433, at *4 (W.D.Pa. Jan. 29, 2010), the court found that Rule 4.4(b) did not apply because the documents at issue had not been sent to the lawyer "inadvertently." Nonetheless, the court found it appropriate to sanction the lawyer, citing several cases in which a lawyer's handling of such documents was deemed sanctionable. *Id.* at *5. In addition, the court asserted that the "unauthorized disclosure" rule of Rule 4.4(b) had been "extended" by various courts to cover materials that are "proprietary" or "confidential," rather than merely privileged. *Id.*

As plaintiffs point out, all of the cases cited by the district court in *Burt Hill* on each of these issues (1) involve privileged documents and (2) rely on prior opinions of the ABA (opinions No. 92–368 and 94–382) since replaced with ABA Formal Opinion No. 06–0440, which states that a "lawyer receiving materials under such circumstances is therefore not required to notify another party or that party's lawyer of receipt as a matter of compliance with the Model Rules."

There may be policy reasons for sanctioning a lawyer who fails to notify a third party of improperly-obtained documents given to counsel without permission, but defendants do not attempt to articulate these and the ABA's revision of its position on this matter weighs against such a view. Assuming defendants are correct in their suggestion that it may be unethical or sanctionable to receive non-privileged, confidential documents without authorization, this would only apply if counsel directed others to obtain those documents and release them without authorization. As explained above, defendants fail to show that plaintiffs' counsel did such a thing.

At most, the semi-sophisticated nature of the anonymous delivery of documents *may* suggest that plaintiffs' counsel have orchestrated circumstances to afford plausible denial, but this is still far from counsel affirmatively directing employees to reveal

confidential documents without authorization, and the fact that the arrangement had other benefits weighs against drawing such an inference. In sum, the evidence fails to support finding that either plaintiffs or their counsel are inadequate representatives of the class based on this conduct alone.[5]

### D. Appointing Class Counsel

Under Fed.R.Civ.P. 23(g)(1), the court must consider "the work counsel has done in identifying or investigating potential claims in the action"; "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; "counsel's knowledge of the applicable law"; and "the resources that counsel will commit to representing the class." Plaintiffs have shown that their proposed lead class counsel, Cohen Milstein Sellers & Toll, PLLC, and their proposed liaison class counsel, Hurley, Burish, & Stanton, S.C., satisfy the requirements of Rule 23(g) and will therefore be appointed.

Cohen Milstein has been recognized by a reputable journal as one of the leading plaintiffs' and class action law firms in the United States and has almost ten years experience handling class action cases, including ERISA cases. The Hurley firm has experience litigating class actions and the counsel from that firm assigned to this case has 14 years of trial experience. In addition, plaintiffs' counsel's filings and performance at hearings up to this point have shown that they are capable of handling the complex nature of this case and properly presenting the case to the court.

Defendants do not identify any problems with appointing the proposed class counsel, except that they believe counsel acted unethically in obtaining confidential documents and failing to notify Trachte. As explained above, defendants' evidence falls short of showing wrongdoing by plaintiffs' counsel

and, thus, this concern, while understandable, is insufficient to deny their appointment.

### E. Due Process

■ Defendants' final argument is that plaintiffs' requested rescission of the spinoff and stock purchase would affect the interests of third parties, including current Alliance ESOP participants, Alliance and lenders to Trachte, who helped fund the purchase of Trachte's stock. According to defendants, because these entities are neither named as parties, nor included in the class definition, the remedy of rescission requested by the class would violate their due process rights. Since defendants made this argument, Alliance has been included as a party.

Regarding the lenders, defendants do not explain how their interests would be affected. As plaintiffs explain, they are not seeking rescission of Trachte's loans; if the entire transaction is rescinded, the money from the stock sale would be returned to the Trachte ESOP and paid to Trachte to pay off the loan to the bank as the loan agreement provides. Even if this were not true, the bank is in the business of lending money under the terms and conditions that accommodate the risks involved. Rescission is just one such risk, and it is hardly a denial of due process if one of its customer's misconduct (or that of third-parties) undermines the customer's ability to repay its loan.

This leaves the due process rights of AH ESOP participants. Defendants rely on the following passage, from *Hastings–Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 456 (S.D.Fla.1988):

> Similar to Fed.R.Civ.P. 19, Fed.R.Civ.P. 23 assures that an individual affected by the possible outcome of a class action is either a member of the putative class or the litigation cannot proceed as a class action. As with all individuals that would be affected by the possible outcome of the litigation, these individuals must be afforded due process. The due process safeguards

---

5. Of course, plaintiffs' and their counsels' unauthorized use of confidential documents in and outside this litigation may expose them to monetary damages or other sanctions, particularly if information were used for any purpose other

than the legitimate prosecution of this lawsuit or disclosed publicly without first allowing defendants to seek a protective order restricting assess.

of Fed.R.Civ.P. 23 are applicable only to those parties before the court as members of a class. If an individual has an interest affected by the possible outcome of a class action, and is neither a party to the action or a member of a class, a court cannot let the class action proceed. The court must utilize its discretion and deny class certification.

In *Hastings–Murtagh*, the court applied this reasoning to deny a motion for class certification for a proposed class action that included only a subset of shareholders although all shareholders would be required to tender back consideration they received if the deal in question were rescinded. *Id.* at 458.

If the 2007 Transaction were rescinded, the direct impact would not be on current participants in the AH ESOP, but rather on Alliance, since it would be required to take back allegedly worthless Trachte stock and lose the original sale. Admittedly, the value of AH ESOP's holdings in Alliance stock may be reduced in value. To the extent a decision in this court affects AH ESOP participants, therefore, it is likely to do so only because the AH ESOP will have a reduced pool from which to draw down their benefits.

More importantly, plaintiffs have already named the AH ESOP as a nominal plaintiff for the purpose of obtaining complete relief. If the participants of the AH ESOP have concerns about their reduced pool of benefits or believe they are entitled to more, they can actively participate in this lawsuit or pursue their own action against those who administer the AH ESOP. *Cf. LLC Corp. v. Pension Benefit Guaranty Corp.*, 703 F.2d 301, 305 (C.A.Mo.1983) (employees who participated in terminated pension plan were not required to be joined as parties to action in which plan and Pension Benefits Guaranty Corporation disputed who was entitled to residue of funds in plan because "[t]he resolution of this case will not impair the employees' ability to sue [their plan] if they believe they are entitled to more money").

## F. Rule 23(b)

Plaintiffs contend that the class may be certified under Rule 23(b)(1), (2) or (3). The court finds that the class may be certified under Rule 23(b)(1) or (2), so it is not necessary to determine whether it may also be certified under Rule 23(b)(3). *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 255 F.R.D. 628, 637 (W.D.Wis.2009) (allowing class to be maintained under Rule 23(b)(3), which allows class members to opt out, would be counterproductive if the class is maintainable under Rule 23(b)(1) or (2), which does not allow opt out).

Rule 23(b)(1) covers actions for which "prosecuting separate actions" would create certain risks, including a risk of "inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class," Rule 23(b)(1)(A), or "adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Rule 23(b)(1)(B).

 In this case, the requirements of both Rule 23(b)(1)(A) and (b)(1)(B) are met. Among other things, plaintiffs are asserting claims against the trustees for breach of fiduciary duty. Suits by individual class members could create inconsistent results for the fiduciaries. *See Neil v. Zell*, 275 F.R.D. 256, 268 (N.D.Ill.2011) (finding class action for breach of fiduciary duty certifiable under Rule 23(b)(1)(A) and (b)(1)(B)). In addition, the relief sought in this case may affect the rights of all participants as a practical matter, because stock or money recovered for the Trachte ESOP will be paid into the plan.

 The requirements for Rule 23(b)(2) are also met. Under Rule 23(b)(2), a class is certifiable if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." In this case, defendants "acted . . . on grounds that apply generally to the class" when they proceeded with the 2007 Transaction, and plaintiffs are pursuing injunctive and declaratory relief including a declaration of breach, rescission, disgorgement and equi-

table monetary relief. *Smith v. Aon Corp.,* 238 F.R.D. 609, 618 (N.D.Ill.2006) ("Monetary relief in a plan-wide action brought under ERISA section 502 is incidental, and flows from relief to the plan.").

## G. Notice

The record establishes that the proposed class satisfies the prerequisites for Rule 23(a) and can be maintained under Rule 23(b)(1) or (2). The next step is deciding whether the proposed class members should receive some notice of this action. Neither party has requested the opportunity to notify the class, but that does not resolve the matter.

Rule 23(c)(2)(A) provides that, "[f]or any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class." Unlike for class actions certified under Rule 23(b)(3), the language of 23(c)(2)(A) is permissive, but it remains the court's duty to determine whether notice is proper. As Judge Crabb explained in *Ruppert,*

> When Rule 23 was amended in 2003 to provide explicitly for a permissive notice provision for classes such as this one certified under Rule 23(b)(1) or (b)(2), it was to emphasize that members of these types of class actions "have interests that may deserve protection by notice." To decide whether notice is proper in such actions, the court should "balanc[e] the risk that notice costs may deter the pursuit of class relief against the benefits of notice."

255 F.R.D. at 637–38 (quoting Fed.R.Civ.P. 23, advisory committee note of 2003).

Because neither party addresses this matter, it remains unclear whether notice would be appropriate. The parties should consult on this issue no later than Monday, September 26, 2011, and submit their position(s) on this matter to the court on or before Wednesday, September 28, 2011. If the court determines that notice is appropriate, the cost of notice will be plaintiffs' burden barring good cause shown. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 179, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("[T]he plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit.").

ORDER

IT IS ORDERED THAT

1. Plaintiffs' motion for certification of a class action under Fed.R.Civ.P. 23, dkt. # 187, is GRANTED; the class and subclass are certified and defined as follows:

a. CLASS: Participants in the Trachte ESOP at any time from August 29, 2007 to the present who had an account or received an allocation which they did not subsequently forfeit under the terms of the Plan and the beneficiaries of such participants, excluding any fiduciary of the Trachte ESOP or Alliance ESOP during the 2007 Transaction on or about August 29, 2007 and any members of their immediate families, legal representatives, heirs, successors or assigns.

b. SUBCLASS: All persons who were participants or beneficiaries of the Alliance ESOP at the time of the 2007 Transaction and whose accounts were transferred to the Trachte ESOP on or about August 29, 2007 as part of the 2007 Transaction, excluding any fiduciary of the Trachte ESOP or Alliance ESOP during the 2007 Transaction on or about August 29, 2007 and any members of their immediate families, legal representatives, heirs, successors or assigns.

2. Plaintiffs' motion for appointment of class counsel under Rule 23(g) is GRANTED; Cohen Milstein Sellers & Toll is APPOINTED Lead Class Counsel and Hurley Burish & Stanton, S.C. is APPOINTED Liaison Class Counsel.

3. The parties may have until September 28, 2011 in which to consult and present their position(s) regarding whether issuance of notice is proper in this case.